[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-14380
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 29, 2008
THOMAS K. KAHN
CLERK

D.C. Docket No. 04-10129-CV-JLK

HEMISPHERX BIOPHARMA, INC.,
a Delaware corporation,

Plaintiff-Appellant,

versus

JOHANNESBURG CONSOLIDATED INVESTMENTS,
a South African corporation,
ANNA FRANCINA VENTER and RAINOTES BANTUBONKE NDUNA,
Provisional Trustees of the estate of R. B. KEBBLE,
H. C. BUITENDAG,
BART GOEMAERE,
JOHN DOE,

Defendants-Appellees.

BIOCLONES (PROPRIETARY) LIMITED,
a South African corporation,
CYRIL DONNINGER,

Defendants.

Appeal from the United States District Court
for the Southern District of Florida

_____

**(December 29, 2008)**

Before TJOFLAT, CARNES and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

This lawsuit arose out of an alleged hostile takeover attempt of a publicly traded company. Plaintiff-appellant, a Delaware corporation, filed suit against two South African corporations along with several named and unnamed individual defendants under sections 13(d) and 14(e) of the Securities and Exchange Act of 1934 ("Exchange Act") and for common law fraud.[1] Some of the defendants-appellees moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), or alternatively, to stay a portion of the action pending arbitration in South Africa. The district court dismissed the case with prejudice as to sections

---

[1] We shall refer in this opinion to the following sections of the Exchange Act by their historical nomenclature. They are codified as follows:

| Securities and Exchange Act of 1934 | 15 U.S.C. § 78 |
|---|---|
| Section 3 | § 78(c) |
| Section 10(b) | § 78j(b) |
| Section 13(d) | § 78m(d) |
| Section 14(a) | § 78n(a) |
| Section 14(d) | § 78n(d) |
| Section 14(e) | § 78n(e) |
| Section 16(b) | § 78p(b) |

2

13(d) and 14(e) of the Exchange Act, and dismissed the fraud count without prejudice. We reverse and remand in part, and affirm in part.

## I.

## A.

Plaintiff Hemispherx Biopharma, Inc. ("Hemispherx"), was a pharmaceutical research and development company that specialized in nucleic acid technologies.[2] In particular, Hemispherx pursued the commercialization of RNA drugs.[3] Hemispherx's lead pharmaceutical compound was a RNA drug with the trade name Ampligen, which was authorized by the United States Food and Drug Administration for various diseases. In addition to Ampligen, Hemispherx also produced a drug called Oragens.

Hemispherx was headquartered in Philadelphia, Pennsylvania, and was registered to do business in Florida. Hemispherx frequently conducted meetings in a facility in southern Florida. The company's common stock was listed and traded

---

[2] Upon review of the district court's order granting the defendants' motion to dismiss, we accept the facts alleged in the complaint as true and present them in the light most favorable to the plaintiff. See e.g., Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984).

[3] RNA is the abbreviation for ribonucleic acid. According to Hemispherx, RNA "is a form of nucleic acid which orchestrates a cell's behavior and which regulates the action of groups of cells, including the activation of an otherwise dormant cellular defense against viruses and tumors."

on the American Stock Exchange under the symbol HEB. Hemispherx had 40,000,000 shares of outstanding stock at all times relevant to this appeal.

The defendants in this case spanned the globe. Bioclones (Proprietary) Limited ("Bioclones") was a South African biotechnology company headquartered in Sandton, South Africa. Cyril Donninger ("Donninger") served as the Chief Executive Officer of Bioclones until December 2004, when he resigned from that position. Donninger was also a major Bioclones shareholder, controlling forty percent of the equity in the company. Johannesburg Consolidated Investments ("JCI") was a publicly traded South African company, with its principal place of business in Johannesburg, South Africa. JCI held 60 percent of the equity in Bioclones. R. B. Kebble ("Kebble") was the Chief Executive Officer of JCI and a citizen of South Africa. Kebble was murdered during the pendency of this appeal.[4] H.C. Buitendag ("Buitendag") was the Chief Financial Officer of JCI and a citizen of South Africa. We refer collectively to Bioclones, Donninger, JCI, Kebble, and Buitendag as the "South African defendants."

---

[4] Appellants filed a motion for suggestion of the death of Kebble on October 4, 2005. On November 2, 2005, we stayed the appeal for sixty days. A little over one month later, on December 13, 2005, the stay was lifted and we permitted the executors of Kebble's estate, Simon D. McKenzie and Jeffrey Closenberg, to be substituted in as appellees for Kebble's estate. In our order dated May 3, 2007, we ordered the substitution of Anna Francina Venter and Rainotes Bantubonke Nduna, (the Provisional Trustees of the estate of R. B. Kebble), as Defendant-Appellee in place of the co-executors of the estate, Simon D. McKenzie and Jeffrey Closenberg.

Moving from Africa to Europe, Bart Goemaere ("Goemaere") was a Biotech consultant for BeursTIPS, a European investment publication. According to the amended complaint, Goemaere controlled approximately 30 percent of Hemispherx shares at the time of the attempted takeover. While Hemispherx asserted in its amended complaint that Goemaere was a citizen of the Principality of Monaco and was domiciled there, Goemaere responded in his answer that he no longer lived in Monaco and had moved to Belgium. In a hearing held before the district court on April 18, 2005, counsel for Hemispherx effectively amended its complaint when it stated that Goemaere was a resident of Belgium.

On October 13, 1994, Hemispherx granted Bioclones a license for the development, manufacture, use, and sale of certain products, including Ampligen, in non-U.S. territories. Under the licensing agreement, Hemispherx was required to provide all of its documents, records, computerized records and other data constituting "licensed know-how"[5] to Bioclones. The licensed products and know-

_____

[5] "Licensed know-how," as defined in the licensing agreement, included:

> [A]ny and all data, information, technology or special ability on the part of the licensor in the field of double-stranded ribose nucleic acids and their uses including, but not limited to, processes, techniques, specifications, methods, products, materials and compositions, manufacture, testing in animals and man and the results thereof, registration dossiers, market data or use of any licensed products and their manufacture and formulations, owned by the licensor during the term of this Agreement or obtained through agreement with third parties and which is directly related to the

5

how were based on patents owned by Hemispherx, namely Ampligen and Oragens. Bioclones was, in turn, required to create a separate corporation for the manufacture and supply of certain licensed products; Hemispherx and Bioclones would share ownership in this new corporation. The agreement also gave Bioclones the right of first refusal to license Hemispherx's product Oragens.

The licensing agreement contained an arbitration clause providing for the resolution of disputes in South Africa; it provided, in pertinent part: "Any dispute at any time between the parties hereto arising out of or pursuant to this Agreement or its interpretation, rectification, breach or termination shall be submitted to and be decided by arbitration in terms of the Arbitration Act, 1965, of the Republic of South Africa." The licensing agreement lasted for the life of the licensed patents and until three years after the expiration of the last of the licensed patents. The licensing agreement was amended several times, but this basic structure was not altered.

In mid-2002, almost eight years after the initial licensing agreement, Donninger reduced his shares in Bioclones from 100 percent to 50 percent of the company, and JCI purchased a 50 percent interest in Bioclones. Later, Donninger

---

licensed patents and licensed products and their use and which is useful or required in seeking approval from regulatory authorities to market licensed products and which includes all toxicological and safety data . . . .

6

reduced his equity in Bioclones to 40 percent. JCI, as Bioclones' new shareholder, urged Bioclones to make additional investments in Hemispherx; JCI was particularly interested in Hemispherx's product called Oragens. From mid to late 2002, Bioclones expressed this interest to Hemispherx. In furtherance of Bioclones' interest, Donninger allegedly made the following oral and/or written representations to Hemispherx:

> (i) Bioclones was interested in providing substantial additional capital to Hemispherx for the purpose of funding Hemispherx's ongoing operations, including the completion of clinical trials, pending regulatory processes and product development; (ii) Bioclones represented that it had sufficient cash reserves, liquid assets and/or value to fund those operations; (iii) Bioclones claimed to be a thriving South African pharmaceutical company with a value of $400,000,000 and having such cash reserves in the tens of millions of dollars; (iv) Bioclones was interested in a Hemispherx product called Oragens, which Donninger believed could surpass Ampligen; and (v) Donninger and Bioclones represented that a substantial investment would be made in order to fund construction of a manufacturing facility which would comply fully with regulatory requirements, including FDA requirements.

The amended complaint asserts that representatives of JCI made and/or ratified the representations outlined above. Specifically, Hemispherx claimed that Kebble and Buitendag, as JCI executive officers, knew and approved of these representations. The representations were made at meetings held in Philadelphia, Pennsylvania and Tavernier, Florida in September 2002 and in London, England in

7

October 2002. The September meetings were held, per Donninger's request, to conduct financial and scientific due diligence of Hemispherx in relation to Bioclones' investment in Hemispherx. Relying on the foregoing, representatives for Hemispherx met with Donninger and provided full disclosures in accordance with the requested due diligence review. Hemispherx shared with Bioclones highly sensitive proprietary, financial, and technical information, along with information related to Oragens, in reliance on the potential investment. Hemispherx alleged that it was under no pre-existing obligation to make such disclosures.

On November 14, 2002, Bioclones sent a letter to the directors and executive officers of Hemispherx, proposing a merger of the two companies. Under the proposed terms of the deal, Bioclones shareholders would ultimately own 50 percent of the shares of the combined entity by exchanging Hemispherx shares for 100 percent of Bioclones shares.[6] The letter explicitly stated that the proposal was "purely for initial discussion purposes and is in no way to be construed as a legally binding offer capable of acceptance." Bioclones also wrote that the letter was

[6] The letter stated:

> The shareholders approve a doubling of the authorised share capital to 100m ordinary shares and 39.8m of these be issued to Bioclones shareholders in return for 100% of the share capital of Bioclones, including all assets, rights and intellectual property. Thus Bioclones shareholders would own 50% on a fully diluted basis of the combined entity.

confidential to the Hemispherx board of officers and directors and that any public reference to the letter would result in an immediate termination of Bioclones' interest. Upon receipt and review of the letter, Hemispherx decided to conduct its own due diligence of Bioclones, and informed Bioclones to that effect.

Hemispherx claims that its due diligence of Bioclones uncovered multiple material false representations made by the South African defendants.[7] Namely, Hemispherx contends that the South African defendants made or allowed to be made the following false representations:

> (i) The alleged funding and construction of manufacturing facilities for RNA polymers which would fully comply with FDA requirements for production of Ampligen raw materials was not happening and did not occur; (ii) Bioclones did not have and never had sufficient assets and reserves to make a substantial capital investment in Hemispherx sufficient to fund ongoing Hemispherx operations; (iii) Bioclones did not have millions of dollars in cash reserves nor a value of approximately $400,000,000; and (iv) Bioclones had not obtained significant expertise in the FDA process and was not obtaining FDA regulatory approval for its manufacturing facilities.

The amended complaint asserts that the South African defendants made these false representations with the intent to deceive, manipulate or defraud Hemispherx, and that Hemispherx reasonably relied on these representations to its detriment. While

---

[7] The amended complaint states that the "[d]efendants" made these representations or allowed them to be made. In the context of the amended complaint, however, it appears that Hemispherx was referring only to the South African defendants and not Goemaere.

9

Hemispherx does not provide the specifics of exactly how or when these representations were made, the amended complaint does cite Donninger and "other sources" as providing information about Bioclones' financial situation.

In addition to learning about the allegedly false representations made by the South African defendants, Hemispherx claims that the November 14, 2002 letter was actually the commencement of a hostile takeover attempt. The amended complaint asserts that the South African defendants worked in concert with Goemaere to force the removal of Hemispherx management and take control of the company. Hemispherx alleges that Goemaere either obtained a copy of the November 14, 2002 letter or learned of its material terms. Throughout 2003 and 2004, Hemispherx contends that Goemaere communicated, both orally and in writing, with Hemispherx shareholders, endorsing not only the proposed merger but also a hostile takeover and the removal of Hemispherx management. Goemaere allegedly made strides toward this end by raising money and seeking control of millions of Hemispherx shares throughout 2003 and 2004.[8]

---

[8] The amended complaint alleges that Goemaere participated in an effort to raise money for the hostile takeover through a private placement memorandum. Hemispherx also contends that Goemaere sought control of Hemispherx shares from a broker-dealer in Connecticut, Chinese investors, a resident of Belgium, a former Hemispherx officer, and an investor who resides in Florida. It does not allege, however, whether Goemaere ultimately acquired any of these shares. The amended complaint simply provides that, "Goemaere stated that he controlled 11 million shares [of Hemispherx] in 2003 and 16 million shares in 2004." (emphasis added).

10

Hemispherx claims that Goemaere acted in concert with the South African defendants pursuant to an express agreement or understanding to achieve a hostile takeover of Hemispherx. Hemispherx cites a number of facts to support this contention. First, Hemispherx claims that a JCI director reported that Hemispherx was "in play" in late 2002, which Hemispherx interpreted as a "veiled threat." Second, Goemaere went to South Africa in early 2003 and met with directors of Bioclones and JCI "in furtherance of a coordinated and concerted effort to effect the hostile takeover of Hemispherx." In mid-2003, Goemaere's business partner, who was also a Hemispherx shareholder, traveled to South Africa and met with Donninger, and Hemispherx "believes" the business partner was traveling in furtherance of the hostile takeover with the knowledge and support of the South African defendants. Hemispherx also claims that Goemaere, his business partner, and Donninger engaged in regular telephone conferences throughout 2003 and into early 2004, in furtherance of the hostile takeover bid. As recounted above, Goemaere attempted to persuade Hemispherx shareholders to support the hostile takeover of Hemispherx and merger with Bioclones. In late 2004, Kebble and Buitendag called the Chief Executive Officer ("CEO") of Hemispherx , once jointly and once by Kebble alone, proposing a Hemispherx merger with Bioclones and the removal of Hemispherx management. Goemaere also called a Hemispherx director

11

in December 2004, stating that he controlled 30 percent of Hemispherx outstanding stock and threatened a hostile takeover. Additionally, Donninger reported to Hemispherx in December 2004 that he had resigned from Bioclones and that Bioclones and JCI were experiencing serious financial problems.

Hemispherx alleges that both Goemaere and the South African defendants tried to manipulate and drive down the price of Hemispherx stock in an attempt to acquire additional shares. The following facts were cited by Hemispherx in support of this assertion: 1) Bioclones filed patents that infringed on Hemispherx's patent estate in an attempt to drive down the value of Hemispherx's patent estate, and therefore the price of Hemispherx stock; 2) Bioclones and Donninger publicly questioned whether Bioclones' manufacturing facility complied with international standards for the production of Ampligen raw materials for Hemispherx; and 3) Goemaere published in BeursTIPS allegedly false and misleading information about Hemispherx's management.

In the end, no takeover occurred. The merger proposed in Bioclones' November 14, 2002, letter to Hemispherx never transpired. Hemispherx does not allege that any negotiation over the proposed merger ever occurred. Nor does Hemispherx allege that the South African defendants ever purchased any shares of Hemispherx. Hemispherx contends, nevertheless, that Goemaere and the South

12

African defendants agreed to act as a group to acquire, hold, vote and dispose of Hemispherx shares. Hemispherx claims that by virtue of this agreement between Goemaere and the South African defendants, the defendants collectively "controlled" the voting of Goemaere's shares of Hemispherx and were thus "beneficial owners" of those shares under section 13(d) of the Exchange Act. Hemispherx claimed it was injured from the allegedly illegal effort to take over Hemispherx and filed suit.

B.

Hemispherx sued Bioclones, JCI, Donninger, Kebble, Buitendag, Goemaere, and several unnamed defendants on December 21, 2004. Hemispherx's initial verified complaint recited the facts as outlined above and contained two counts. Count 1 alleged violations of sections 13(d),[9] 14(d),[10] and 14(e)[11] of the Exchange

---

[9] Section 13(d)(1) provides:
Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title, . . . is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78m(d)(1).

[10] Section 14(d) provides, in pertinent part, "It shall be unlawful for any person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or

13

Act against all of the defendants, and Count 2 charged the South African

defendants with common law fraud. The South African defendants moved to

dismiss the complaint on February 14, 2005, and Hemispherx filed an amended

verified complaint on March 7, 2005. The counts in the amended verified

complaint are the same as those in the original complaint, except that Hemispherx

dropped the allegation that the defendants had violated section 14(d) of the

Exchange Act. Hemispherx sought declaratory and injunctive relief under Count 1

and damages under Count 2.

On March 24, 2005, the South African defendants filed a motion to dismiss

the action or stay a portion of the action pending arbitration in South Africa

pursuant to the arbitration clause in the licensing agreement. Goemaere did not

---

any facility of a national securities exchange or otherwise, to make a tender offer for, or a request or invitation for tenders of, any class of any equity security...if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 per centum of such class . . . ." 15 U.S.C. § 78n(d).

[11] Section 14(e) provides:
It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 78n(e).

join in the motion to dismiss. Instead, he responded to the amended complaint in a letter dated April 10, 2005. The district court held a hearing on April 18, 2005, regarding the South African defendants' motion to dismiss. On July 8, 2005, the district court entered a final order dismissing the action as to defendant Goemaere for lack of personal jurisdiction. As for the South African defendants, the district court dismissed Count 1 with prejudice and dismissed Count 2 without prejudice.

Hemispherx now appeals, presenting three reasons for reversal. First, Hemispherx claims that the district court erred in dismissing the claims against Goemaere for lack of sufficient service of process. Second, Hemispherx argues that the court erred in dismissing Count 1 when it determined that the complaint did not adequately allege beneficial ownership by the defendants under section 13(d) of the Exchange Act. Finally, Hemispherx contends that the district court erred in dismissing the fraud count because the dispute is not subject to the arbitration clause in the licensing agreement. We address these arguments in turn.

## II.

Hemispherx appeals the district court's dismissal of the claim against Goemaere for insufficient service of process.[12] The record indicates that Goemaere

---

[12] Of the two counts in the amended complaint, Goemaere was only implicated in the first count. As discussed supra, Hemispherx alleged in Count 1 of the amended complaint that Goemaere and the South African defendants violated sections 13(d) and 14(e) of the Exchange

responded to the amended complaint in a letter dated April 10, 2005. The letter was addressed to counsel for Hemispherx and the Clerk of the Court for the Southern District of Florida. In his thirteen page letter, excluding attachments, Goemaere addressed each of the allegations made in the amended complaint. It does not appear that the letter was prepared by an attorney, as it was written by Goemaere in the first-person narrative voice and was styled as a letter rather than a motion or answer. The epistolary form notwithstanding, Goemaere filed the functional equivalent of an answer to Hemispherx's amended complaint.

In his answer, Goemaere discussed his relationship with Hemispherx and responded to each of the allegations made in the amended complaint. Goemaere also wrote, "I am strongly wondering if, just because I have visited Florida once (the visit was an organized event of the plaintiff itself), the Court has personal jurisdiction over me." Goemaere also wrote, in closing the letter, that "the plaintiff fail[ed] to prove it ha[d] personal jurisdiction over [him]," and moved the court to dismiss the count against him.

While these statements were effectively objections to the court's exercise of jurisdiction over Goemaere, Goemaere did not raise any issue with respect to service of process. In the first sentence of his answer, Goemaere wrote, "I am

Act.

16

responding to the amended complaint that has been forwarded to me and that I have received recently by postal mail." This is the only reference to service of process made in Goemaere's letter.

Goemaere did not appear before the court at the hearing held on April 18, 2005 to discuss the South African defendants' motion to dismiss. At the hearing, counsel for the South African defendants acknowledged that Goemaere had sent "something" to the court, but clarified that they did not represent him. Upon confirming that counsel for the South African defendants did not represent Goemaere, the court proceeded with the parties before it. Goemaere, to this day, has not appeared before the district court.

On July 8, 2005, the district court entered its final order of dismissal, and dismissed Hemispherx's claim against Goemaere for insufficient service of process. In a footnote in the court's final order of dismissal, the court held, "It appears from the record that Plaintiff failed to properly serve Defendant Goemaere. As such this Court find[s] that it lacks jurisdiction over Defendant Goemaere." The district court's disposition of the claim against Goemaere comprised only these two sentences; it did not reach the merits of Goemaere's defense that the court lacked personal jurisdiction due to insufficient contacts with the forum. Prior to its final

17

order, the district court gave no indication that it was considering dismissing the claim against Goemaere.

Hemispherx now appeals the dismissal, claiming that Goemaere waived any right to challenge insufficient service of process by answering the amended complaint without objecting to service of process. Goemaere did not file a brief with this court on appeal. We review the district court's construction of the Federal Rules of Civil Procedure de novo, and its factual findings for clear error. Beck v. Prupis, 162 F.3d 1090, 1100–01 (11th Cir. 1998) (citations omitted).

"Service of process is a jurisdictional requirement: a court lacks jurisdiction over the person of a defendant when that defendant has not been served." Pardazi v. Cullman Med. Ctr., 896 F.2d 1313, 1317 (11th Cir. 1990). Challenges to service of process will be waived, however, if not raised under Federal Rule of Civil Procedure 12. See id. Under Rule 12, a defendant must raise any challenge to the sufficiency of service of process in the first response to the plaintiff's complaint; i.e., the defendant must include the defense in either its pre-answer motion to dismiss, or if no pre-answer motion is filed, then the defense must be included in the defendant's answer. See Fed. R. Civ. P. 12(b), (g), (h); 1 Moore's Manual: Federal Practice and Procedure § 11.23 (2007); Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1391 (3d ed. 2004). Once a defendant has

18

waived any objection to insufficient service of process, "the court may not, either upon the defendant's motion or its own initiative," dismiss on that ground. Pardazi, 896 F.2d at 1317.

Here, Goemaere failed to raise any objection to service of process under Rule 12. Goemaere did not file a pre-answer motion to dismiss, nor did he specifically raise insufficiency of service of process in his answer to the amended complaint. Goemaere did, however, challenge the court's exercise of personal jurisdiction over him in his answer. The question then becomes, did Goemaere's objection to personal jurisdiction properly raise a challenge to the sufficiency of service of process? While we expressly declined to answer the question in Pardazi, 896 F.2d at 1318 n.4, we now hold that objecting to personal jurisdiction is not sufficient to raise an objection to service of process under Rule 12. See Fed. R. Civ. P. 12.

In applying Rule 12, we are mindful of the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S. Ct. 441, 449, 151 L. Ed. 2d 339 (2001) (internal quotation marks and citations omitted). Rule 12(b) enumerates seven defenses which may be asserted in a pre-answer motion or

19

responsive pleading.[13]  Lack of personal jurisdiction, Rule 12(b)(2), and insufficiency of service of process, Rule 12(b)(5), are listed as separate defenses under Rule 12.  Fed. R. Civ. P. 12(b).  Rule 12(b)(5) would be redundant if we recognized an objection to personal jurisdiction as an acceptable means of challenging the sufficiency of service of process.  Simply put, a litigant must cite each separate Rule 12(b) defense in the pre-answer motion or if no pre-answer motion is filed, then in the responsive pleading.  Citing one Rule 12(b) defense in the hope that it will sufficiently raise another defense is not permissible.  This construction of Rule 12(b) has been adopted by the majority of our sister circuits.  See e.g., American Ass'n of Naturopathic Physicians v. Hayhurst, 227 F.3d 1104, 1108 (9th Cir. 2000) (holding that defendant waived objection to personal jurisdiction when he only raised improper service of process in his first filing to the court); Roque v. United States, 857 F.2d 20, 21–22 (1st Cir. 1988) (noting that "Rule 12(b) distinguishes between the defenses of lack of personal [jurisdiction] and insufficient service of process" and that "[i]f the true objection is insufficient

_____

[13]  The seven defenses include: "(1) lack of jurisdiction over the subject matter; (2) lack of jurisdiction over the person; (3) improper venue; (4) insufficiency of process; (5) insufficiency of service of process; (6) failure to state a claim upon which relief can be granted; and (7) failure to join a party under Rule 19."  Fed. R. Civ. P. 12(b).

20

service of process, we do not think it is too much to require a litigant to plainly say so" rather than invoking an objection to personal jurisdiction).

In this case, Goemaere did not cite insufficiency of service of process as a reason for the court to dismiss the charge against him. In his answer, Goemaere objected to personal jurisdiction due to his lack of contact with the forum. By failing to cite insufficiency of service of process in his answer, Goemaere waived that defense. Citing personal jurisdiction was not enough to invoke a challenge to service of process. Accordingly, we hold under Pardazi that the district court erred in dismissing the claim against Goemaere for insufficient service of process when Goemaere had already waived that defense.

III.

We next address whether Count I of the complaint failed to state a claim under section 13(d) because not every member of the alleged "group" was a beneficial owner of Hemispherx shares.[14] Whether individuals or entities without a

---

[14] Though not raised by the district court nor the parties, there may be an open question as to whether a private cause of action lies in issuers to enforce section 13(d). Both the text and legislative history of section 13(d) are silent on this point. When a statute does not expressly provide for a private cause of action, as section 13(d) does not, we conduct a four-part analysis to discern congressional intent to imply a private cause of action: (1) "is [the plaintiff] one of the class for whose especial benefit the statute was enacted"; (2) "is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) "is it consistent with the underlying purposes of the legislative scheme to imply a remedy for the

beneficial ownership interest in a company's securities can nonetheless become members of a "group" within the meaning of section 13(d)(3) of the Exchange Act is an issue of first impression in this circuit. If the answer is yes, then the defendants should have made the disclosures required under section 13(d)(1) of the Act. If the answer is no, they were not required to file the disclosures and the district court's dismissal of Hemispherx's section 13(d) claim should be affirmed.

As in any case involving statutory construction, we begin with the plain language of the statute. Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S. Ct. 2051, 2056, 64 L. Ed. 2d 766 (1980). "We do not look at one word or term in isolation, but instead we look to the entire statutory

plaintiff"; and (4) "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." Cort v. Ash, 422 U.S. 66, 78, 95 S. Ct. 2080, 2088, 45 L. Ed. 2d 26 (1975) (internal quotations marks and citations omitted); see also Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S. Ct. 2479, 2485, 61 L. Ed. 2d 82 (1979).

This Court has considered this issue twice. In Liberty Nat'l Ins. Holding Co. v. Charter Co., 734 F.2d 545, 561 (11th Cir. 1984), the panel held, after applying the Cort test, that Congress did not intend for § 13(d) to implicitly create a private cause of action for the issuer and that § 13(d) does not provide for private injunctions to divest. A little over a year after Liberty National was decided, another panel of this court held in Florida Commercial Banks v. Culverhouse, 772 F.2d 1513, 1519 (11th Cir. 1985), that issuers have an implied cause of action under § 13(d) for injunctive relief to compel a qualifying shareholder to file a corrective Schedule 13D. The Culverhouse panel reasoned that "[s]ince the remedy that the plaintiffs sought in Liberty National was significantly different from the remedy sought in the instant case," it was free to "independently determine whether" an implied cause of action existed. Culverhouse, 772 F.2d at 1516. Because this issue was not raised by the parties or addressed by the district court, we do not decide which interpretation is appropriate here. Tanner Adver. Group, L.L.C. v. Fayette County, Ga., 451 F.3d 777, 785 (11th Cir. 2006) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.") (internal citations omitted).

22

context." United States v. DBB, Inc., 180 F.3d 1277, 1281 (11th Cir. 1999).

However, where the statutory language is ambiguous "we may look beyond the

plain language of a statute at extrinsic materials." CBS Inc. v. PrimeTime 24 Joint

Venture, 245 F.3d 1217, 1226 (11th Cir. 2001) (citation omitted). If "the language

of the statute does not clearly answer our question . . . we must look beyond the

text and determine the legislative intent." DBB, Inc., 180 F.3d at 1282.

Section 13(d)(1) of the Exchange Act is a reporting provision that requires

any person who accumulates more than five percent of the stock of a publicly held

company to disclose certain information to the issuer of the stock, the exchanges on

which the stock is traded, and the SEC. See 15 U.S.C. § 78m(d)(1).

If a filing is required under section 13(d)(1), the information that the filer

must disclose is extensive. It includes: (1) the background and identity of the

person who acquired the shares "and all other persons by whom or on whose behalf

the purchases have been or are to be effected;" (2) "the source and amount of the

funds . . . used or to be used in making the purchases;" (3) "if the purpose of the

purchases . . . is to acquire control of the business . . . any plans or proposals . . . to

liquidate such issuer, to sell its assets to or merge it with any other persons, or to

make any other major change in its business or corporate structure;" (4) the number

of shares owned and the number of shares the person has "a right to acquire,

23

directly or indirectly," including those "by each associate of such person, giving the background, identity, residence, and citizenship of each such associate;" and (5) "information as to any contracts, arrangements, or understandings with any person" regarding the securities, "naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof." 15 U.S.C. § 78m(d)(1)(A)–(E). Under SEC regulations, all of that information must be included on a Schedule 13D form. See 17 C.F.R. § 240.13d-101.

SEC Rule 13d-3 defines a "beneficial owner" for purposes of § 13(d) as "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares" "[v]oting power which includes the power to vote, or to direct the voting of, such security" and/or "[i]nvestment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3(a).

Section 13(d)(3) is the critical provision in this case. It addresses group membership for purposes of section 13(d) and provides that "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."

15 U.S.C. § 78m(d)(3)). The SEC regulation under section 13(d)(3) further provides that "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership . . . of all equity securities of that issuer beneficially owned by any such persons." 17 C.F.R. § 240.13d-5(b)(1).

The text of sections 13(d)(1) and 13(d)(3) leaves open the question of whether beneficial ownership of stock is required for group membership within the meaning of paragraph (d)(3). Section 13(d)(3) does not expressly require or rule out a beneficial ownership requirement, or even mention the term "beneficial owner." Nor does the applicable SEC regulation address the question. Rule 13d-5 instructs that when a section 13(d)(3) group is formed, each member of the group "shall be deemed to have acquired beneficial ownership . . . of all equity securities . . . beneficially owned by any such persons." 17 C.F.R. § 240.13d-5(b)(1). Put another way, the regulation provides that when two or more persons act as a section 13(d)(3) group, each individual member is deemed to beneficially own the securities owned by all of them. It does not rule out a non-beneficial owner becoming a member of a section 13(d)(3) group and thereby being treated as a beneficial owner of all of the securities owned by any group member. Nor does it

compel that result. The regulation simply does not say one way or the other. But see Rosenberg v. XM Ventures, 274 F.3d 137, 145 (3d Cir. 2001) (finding "support" in Rule 13d-5 for its conclusion that no person who is not already a beneficial owner can be a member of a section 13(d)(3) group). The question, then, is whether the context of section 13(d)(3) and the congressional purpose behind it show that beneficial ownership of securities is required for group membership.

Hemispherx argues that reading a beneficial ownership requirement into section 13(d)(3) is contrary to the statute's plain language, ignores the general definition of the term "person" found in the Exchange Act, misconstrues the relevant SEC regulations, and ignores the principles of partnership law. The defendants counter that: (1) section 13(d)(3), read in the context of the rest of section 13(d), indicates that beneficial ownership is required; (2) in view of the information that they are designed to elicit, section 13(d) filings make no sense if applied to individuals without actual beneficial ownership in any shares; (3) Hemispherx's reading of section 13(d)(3) would impose liability on various professionals who should not be liable under the Act; (4) interpreting the Act as Hemispherx suggests would allow the management of publicly held companies to wield the section 13(d) filing requirements as a weapon to intimidate dissident

shareholders; and (5) Hemispherx's claim is premised on a "secondary liability" theory that has been rejected in other contexts under the securities laws.

The more persuasive arguments support the conclusion that a beneficial ownership interest is necessary to become a member of a group within the meaning of section 13(d)(3) of the Exchange Act. That is what the Third Circuit concluded in Rosenberg, 274 F.3d at 147–48. In Rosenberg, the court addressed a claim that the defendants had violated section 16(b) of the Exchange Act. Id. at 142. Because the SEC defined beneficial ownership for purposes of section 16(b) by reference to section 13(d), see 17 C.F.R. § 240.16a-1(a)(1), the court was required "to determine whether beneficial ownership of a subject issuer's equity securities is a necessary element of group membership within the meaning of section 13(d)(3)." Rosenberg, 274 F.3d at 140. It concluded that each individual member of a section 13(d)(3) group must be a beneficial owner of securities. Id. at 147–48 ("[W]e have concluded that. . . each member of a section 13(d) group must hold beneficial ownership of the equity securities of the issuing entity prior to its entry into such a group." (emphasis omitted)).

Section 13(d) is intended to ensure that an issuer receives notice that a significant amount of its shares is being accumulated. See Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58, 95 S. Ct. 2069, 2075–76, 45 L. Ed. 2d 12 (1975)

27

("The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party."). And the purpose of section 13(d)(3) is to prevent a group of persons from colluding to structure their interests in a company in a pool that would enable each individual to avoid the reporting requirement and evade the purpose of the statute. See H.R. Rep. No. 90-1711 at 7 (1968), as reprinted in 1968 U.S.C.C.A.N. 2811, 2818 (noting that the purpose of section 13(d)(3) is to "prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than [five] percent of the securities").[15] As the court noted in Rosenberg, "[t]he implication is, of course, that each member of the [section 13(d)(3)] group must have something to 'pool.'" 274 F.3d at 146. That 'something' is the "voting or other interests in the securities of an issuer," which refers to various forms of beneficial ownership such as the power to dispose of or direct the disposition of a security. See id.; 17 C.F.R. § 240.13d-3(a). Therefore, the goal of section 13(d)(3) is to prevent persons who already have attained

---

[15] As originally enacted, section 13(d)(3) prevented persons from combining to control over ten percent of the securities.

beneficial ownership of some amount of an issuer's securities from combining to control over five percent of a class of securities, yet ducking the reporting requirement in section 13(d)(1). That is what section 13(d)(3) is about. That is its purpose. See Rosenberg, 274 F.3d at 146 (holding that "the legislative history accompanying section 13(d) manifests Congress' intent that an individual must be a beneficial owner of an issuer's securities prior to becoming a member of a section 13(d) 'group.'").

Further, nothing about that purpose is eroded if section 13(d)(3) groups include only beneficial owners of securities. So long as each beneficial owner who participates in a "partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer," 15 U.S.C. § 78m(d)(3), is part of the group and must be included in the filing under section 13(d)(1), no person or entity will be able to thwart section 13(d)'s purpose.

Although a person who is not a beneficial owner might have an interest in the securities of the company, that person and his interest will not go undetected because only beneficial owners are included in the group for section 13(d)(1) filing purposes. If the total beneficial ownership of all members exceeds the threshold amount of five percent, a Schedule 13D form must be filed disclosing, among other details, "information as to any contracts, arrangements, or understandings with any

29

person with respect to any securities of the issuer . . . naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof." § 13(d)(1)(E) (codified at 15 U.S.C. § 78m(d)(1)(E)). In that manner, a person required to make section 13(d)(1) disclosures must disclose the identity of everyone, including those who are not beneficial owners, who possesses some form of present or future interest in the securities, along with the details of the arrangements or understandings with those non-beneficial owners.

Contrary to Hemispherx's contention, therefore, reading a beneficial ownership requirement into section 13(d)(3) is not inconsistent with traditional notions of partnership law, which recognizes that parties to an agreement may pool different skills or resources. Section 13(d) adequately accounts for the identification of all such persons, including those non-beneficial owners who are not themselves required to file under section 13(d)(1). In this case, for example, Goemaere controlled thirty percent of Hemispherx's stock and was required to file under section 13(d)(1). Although the other defendants were not required to make a similar filing, Goemaere was obligated to disclose their identities and the details of any arrangement that he had with them regarding the Hemispherx stock.

It might be argued that a limitation of the section 13(d)(3) "groups" to those including only beneficial owners would also have to be applied to section

13(d)(1)(E), with the result that an entity that is not a "person" under section 13(d)(3) is also not a "person" under section 13(d)(1)(E). If so, that would mean that contracts or arrangements with non-beneficial owners need not be disclosed. We would not be persuaded by that argument. "[U]nless the context otherwise requires," the Exchange Act defines a "person" as "a natural person, company, government, or political subdivision, agency, or instrumentality of a government." 15 U.S.C. § 78c(a), (a)(9). Section 13(d)(1) does not redefine the term "person" to exclude non-beneficial owners; in fact, it does not define "person" at all, but instead is triggered when any Exchange Act "person" acquires beneficial ownership of more than five percent of a class of equity securities. Through section 13(d)(3), a group of beneficial owners, along with partnerships, limited partnerships, and syndicates, are also considered "persons."

Human beings, companies, and government entities therefore remain "persons" for all purposes within section 13(d). If they do not acquire a beneficial interest in a class of equity securities that exceeds five percent, they do not fall within the ambit of section 13(d)(1) and need not file a Schedule 13D form. See 17 C.F.R. § 240.13d-1. But that does not mean that those entities do not qualify as "persons" under section 13(d)(1)(E). In other words, section 13(d)(3) operates to

31

add particular types of entities to those considered a "person" under section 13(d); it broadens instead of narrows the scope of section 13(d) "persons."

Finally, we are unwilling to interpret section 13(d)(3) so broadly as to include non-beneficial owners because if we concluded that a person need not be a beneficial owner of securities in order to be a member of a group under section 13(d)(3), section 13(d) groups would be expanded beyond reason. As the defendants point out, acquiring more than five percent of a large corporation's stock is no small accomplishment and may require the assistance of legions of attorneys, bankers, financial advisors, and accountants. Those persons could arguably be considered part of a "group [acting] for the purpose of acquiring, holding, or disposing of securities" within the meaning of section 13(d)(3), if there is no requirement of beneficial ownership. This cannot be what Congress intended. It goes far beyond what is necessary or useful to attain Congress' goal of "prevent[ing] a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than [five] percent of the securities," H.R. Rep. No. 90-1711, at 7 (1968), reprinted in 1968 U.S.C.C.A.N. at 2818, and it borders on the absurd.

For all of these reasons, a beneficial ownership interest in securities is necessary to become a member of a group within the meaning of section 13(d)(3) of the Exchange Act. Because Hemispherx does not allege that any of the defendants (other than Goemaere) was a beneficial owner of Hemispherx stock, the other defendants were not part of a section 13(d)(3) group required to file a Schedule 13D form. Accordingly, the district court's dismissal of Count I is affirmed.

IV.

Hemispherx finds error in the district court's dismissal without prejudice of its Count 2 fraud claim and accompanying suggestion that the parties initiate arbitration proceedings in South Africa. Hemispherx argues that the fraud claim is not within the scope of the arbitration clause because the conduct of the South African defendants giving rise to the claim was not "reasonably foreseeable" in 1994 when the licensing agreement and arbitration provision were executed, and thus the dispute did not "arise" out of the agreement. We agree and accordingly reverse.

Although the district court's dismissal of the fraud claim was without prejudice, it falls within the definition of a "final order" appealable under the Federal Arbitration Act ("FAA"). 9 U.S.C. § 16(a)(3); see also Hill v. Rent-A-

Center, Inc., 398 F.3d 1286, 1288 (11th Cir. 2005). We review the district court's interpretation of the arbitration clause de novo. Luckie v. Smith Barney, Harris Upham & Co., Inc., 999 F.2d 509, 512 (11th Cir. 1993).

The FAA embodies a "liberal federal policy favoring arbitration agreements," Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765 (1983); see also Klay v. All Defendants, 389 F.3d 1191, 1200 (11th Cir. 2004). The role of the courts is to "rigorously enforce agreements to arbitrate." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221, 105 S. Ct. 1238, 1242, 84 L. Ed. 2d 158 (1985). At the same time, "[a]rbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S. 468, 479, 109 S. Ct. 1248, 1256, 103 L. Ed. 2d 488 (1989). With these principles in mind, we turn to whether the facts alleged in the amended complaint fall within the arbitration clause in the licensing agreement. See Gregory v. Electro-Mechanical Corp., 83 F.3d 382, 384 (11th Cir. 1996) ("Whether a claim falls within the scope of an arbitration agreement turns on the factual allegations in the complaint rather than the legal causes of action asserted.").

34

As we have previously noted, "[t]he case law yields no clear answer" to the question of how broadly to construe an arbitration clause. Telecom Italia, SpA v. Wholesale Telecom Corp., 248 F.3d 1109, 1114 (11th Cir. 2001). Courts have employed various verbal formulae to describe the relationship between disputes and arbitration clauses,[16] such as "whether the tort or breach in question was an immediate, foreseeable result of the performance of contractual duties," id. at 1116; see also Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH, 585 F.2d 39, 46 (3d Cir. 1978); whether "an action could be maintained without reference to the contract or relationship at issue," Fazio v. Lehman Bros., Inc., 340 F.3d 386, 395 (6th Cir. 2003); whether the disputes have "their origin or genesis in the contract," Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd., 1 F.3d 639, 642 (7th Cir. 1993); or whether "the allegations underlying the claims 'touch matters' covered by the [contract]," Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987).

---

[16] This discussion takes place in the context of a class of arbitration agreements that use similar language, such as "arising from," "arising under," "pursuant to," and "arising during" the contract in question. The clause at issue in this case uses "arising out of or pursuant to." We do not believe there is a significant difference between these slightly different formulations, but do recognize that substantially broader language in the arbitration clause would alter the result of the analysis. See, e.g., Brown v. ITT Consumer Fin. Corp., 211 F.3d 1217, 1221 (11th Cir. 2000) (discussing arbitration clause covering "any dispute between them or claim by either [party to the contract] against the other").

Hemispherx argues that the appropriate test is whether the dispute was reasonably foreseeable to the parties when they entered into the licensing agreement. We have previously focused on foreseeability as proper standard for resolving the scope of an arbitration clause that covers disputes "arising out of or pursuant to" the contract between the parties. See Telecom Italia, 248 F.3d at 1116. In Telecom Italia, we held that if the defendant "could have been" engaged in the allegedly tortious actions even if it "had no contractual relationship with" the plaintiff, then the dispute is not "an immediate, foreseeable result of the performance of the contractual duties" and thus not within the scope of an arbitration clause within that contract. Id. We stated that "[d]isputes that are not related–with at least some directness–to performance of duties specified by the contract do not count as disputes 'arising out of' the contract." Id.

Applied to this case, the question becomes whether the present dispute was a foreseeable result of the performance of the licensing agreement. The amended complaint alleges that in 2002 the South African defendants fraudulently induced Hemispherx to divulge proprietary financial and scientific information in reliance on false representations about the defendants' financial and technological capabilities, which were made in the course of discussions of a possible equity investment in Hemispherx. Hemispherx argues the South African defendants' acts

36

in soliciting these disclosures are unrelated to the licensing agreement in two respects. First, the fraud claim focuses on what the South African defendants represented in 2002 as their then-present capabilities, not what they represented to Hemispherx in the licensing agreement. Second, the fraud claim alleges that as a result of the misrepresentations, Hemispherx revealed information that it was not obligated to reveal under the licensing agreement. Thus, the information exchanged by both sides in the 2002 discussions was not the foreseeable result of fulfilling the duties under the licensing agreement.

The South African defendants contend that the fraud claim is within the licensing agreement for three reasons. First, they argue that the allegedly disclosed information in 2002 was already covered by the licensing agreement, and hence Hemispherx was under an existing obligation to disclose it. Such an interpretation extends beyond Hemispherx's disclosure obligations under the licensing agreement, which was limited to "any and all data and information . . . in the field of double-stranded ribose nucleic acids . . . which is directly related to the licensed patents and licensed products." Hemispherx was not obligated to disclose any financial information about itself, and was not obligated to continuously give the South African defendants scientific information on any of its other projects. The present dispute does not fall within the scope of the licensing agreement's

37

arbitration clause because that agreement is "a contract of limited application" that "does not profess to cover all present and future aspects of the relationship" between Hemispherx and Bioclones.  Seaboard Coast Line R.R. Co. v. Trailer Train Co., 690 F.2d 1343, 1349 (11th Cir. 1982).

Second, the South African defendants argue that the gravamen of Hemispherx's fraud claim is that Bioclones breached portions of the licensing agreement, such as by failing to have an FDA-compliant factory in place. Schematically, this is the mirror image of their first argument, because it claims that the complained-of conduct was Bioclones' failure to fulfill its duties under the licensing agreement.  For similar reasons, this argument fails.  Importantly, the duties that Bioclones undertook to perform in the licensing agreement are different from the representations it made in 2002.  Pursuant to the licensing agreement, Bioclones was to create a new company for the purposes of manufacturing the products licensed from Hemispherx.  The allegedly false representations that the South African defendants made in 2002 concerned their then-present ability to make a substantial investment in Hemispherx and fund the construction of a manufacturing facility for a new line of products.  It is entirely possible that Bioclones had been in breach of its obligations under the licensing agreements and that the representations made by the South African defendants in 2002 were false,

38

but it does not follow that they are one and the same. Contrary to the South African defendants' suggestion, "[l]ying about [one's] ability to perform a contractual obligation" to induce the signing of a contract in the past cannot sweep all future lies and misrepresentations into the ambit of that original contract.

Third and finally, the South African defendants interpret Hemispherx's fraud claim as being a claim for breach of the confidentiality provision in the licensing agreement. In making this argument, they contend that the contract between the parties "contemplat[es] a long-term, ongoing relationship involving scientific research . . . and possible new ventures," and that any information exchanged between the parties fall within the confidentiality provision of that contract. Under this interpretation of the breadth of the arbitration clause, practically every dispute arising from this relationship would be subject to arbitration. Such an interpretation stretches too far the language of the original arbitration clause, which by its own terms covers only disputes arising out of or pursuant to the licensing agreement, and not "the working relationship between the parties." Seaboard, 690 F.2d at 1351. To be sure, it is not always easy to tell in ongoing business relationships whether any given transaction arises from a preexisting contract or instead developed organically from the relationship itself. In this case, it was not foreseeable at the time of the licensing agreement that the South African

39

defendants would, some eight years later, make misrepresentations to Hemispherx in the course of discussing an equity investment in the latter because the investment was not contemplated by that agreement.[17] The parties could have "performed the arbitrable contract perfectly, fulfilling all expectations under that contract," and still be embroiled in this dispute. Gregory v. Electro-Mechanical Corp., 83 F.3d 382, 385 (11th Cir. 1996). Therefore, even in light of the general federal policy in favor of private commercial dispute resolution, the parties' licensing agreement arbitration clause properly construed does not cover this dispute.

V.

For the foregoing reasons, we AFFIRM the district court's judgment with respect to Count 1 and REVERSE and REMAND with respect to Count 2 and the dismissal of Goemaere.

So ordered.

---

[17] Even if we accept the South African defendants' invitation to speculate on what else the parties might have intended for the future of their business relationship, the licensing agreement contains in no uncertain terms a complete integration clause that supercedes all preexisting agreements and understandings, thus foreclosing the argument that the arbitration clause somehow was tacitly understood to extend beyond the obligations in the licensing agreement.