[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-10809

_____

D.C. Docket No. 1:09-cv-23005-JLK

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEP 23, 2011
JOHN LEY
CLERK

JANE DOE,

Plaintiff,
Counter Defendant,
Appellee,

versus

PRINCESS CRUISE LINES, LTD.,
a foreign corporation,
d.b.a. Princess Cruises,

Defendant,
Counter Claimant,
Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 23, 2011)

Before CARNES, FAY and SILER,* Circuit Judges.

_____

*Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

CARNES, Circuit Judge:

On its website, Princess Cruise Lines proclaims to the world, as one of its "core values," that: "The safety and security of our passengers and employees is our most important responsibility."[1] The cruise line says that it recognizes crew members as its "greatest asset," and shows its appreciation to them by making their "life onboard the best it can be."[2] It boasts of making "every effort possible to offer its crew members an enjoyable environment and a rewarding career."[3]

All of those statements are but empty words, and cynical ones at that, if the allegations in the complaint that is before us are to be believed. Those allegations tell a story of a woman, working for Princess Cruise Lines on one of its ships, who was drugged by other employees, raped and physically injured while she was unconscious, and when she reported to officials of the cruise line what had happened to her they treated her with indifference and even hostility, failed to provide her with proper medical treatment on board, and interfered with her

[1] http://www.princess.com/employment/core_values/index.html (last visited Sept. 13, 2011).

[2] http://www.princess.com/employment/onboard_employment/information/working_at_sea/working_at_sea.html (last visited Sept. 13, 2011).

[3] Id.

2

attempts to obtain medical treatment and counseling ashore.[4]

This case is not here, however, for us to determine whether the allegations in the complaint are true. Instead, it comes to us in an appeal by the cruise line from the district court's denial of its motion to compel arbitration of the dispute between it and the plaintiff. The legal issues involve the scope of the arbitration

---

[4]Unfortunately, if congressional reports are to be believed, sexual assaults and other violent crimes on cruise ships are a serious problem. The House Subcommittee on Coast Guard and Maritime Transportation Staff has reported that:

> At a hearing in March 2006 convened by the Committee on Government Reform, cruise industry executives testified that 178 passengers on North American cruises reported being sexually assaulted between 2003 and 2005. During that same period, 24 people were reported missing and four others reported being robbed.

Crimes Against Americans on Cruise Ships: Hearing Before the Subcomm. on Coast Guard and Mar. Transp. of the H. Comm. on Transp. and Infrastructure, 110th Cong. 2 (2007). From fiscal year 2000 through June 2005, the FBI opened 305 case files involving "crime on the high seas," and during those five years about 45% of those cases were sexual assaults that occurred on cruise ships. International Maritime Security: Joint Hearing Before the Subcomm. on Nat'l Sec., Emerging Threats, and Int'l Relations and the Subcomm. on Crim. Justice, Drug Policy, and Human Res. of the H. Comm. on Gov't Reform, 109th Cong. 8 (2005) (statement of Rep. Souder, Chairman of the Subcomm. on Crim. Justice, Drug Policy, and Human Res., Member, H. Comm. on Gov't Reform).

Salvador Hernandez, Deputy Assistant Director of the FBI, testified before Congress in 2007 about sexual and other physical assaults that have taken place on cruise ships: "Sexual assault and physical assaults on cruise ships were the leading crime reported to and investigated by the FBI on the high seas over the last five years, 55 percent and 22 percent respectively . . . . Employees were identified as suspects in 37 percent of the cases, and 65 percent of those employees were not U.S. citizens." Crimes Against Americans on Cruise Ships: Hearing Before the Subcomm. on Coast Guard and Mar. Transp. of the H. Comm. on Transp. and Infrastructure, 110th Cong. 12 (2007) (statement of Hernandez, Deputy Assistant Director of the FBI).

clause in the crew agreement, and we review <u>de novo</u> the district court's interpretation of that clause to determine whether the allegations of the complaint fall within its scope. <u>See</u> <u>Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.</u>, 553 F.3d 1351, 1366 (11th Cir. 2008) (stating that "[w]e review the district court's interpretation of the arbitration clause <u>de novo</u>" and consider "whether the facts alleged in the amended complaint fall within the arbitration clause"); <u>see also</u> <u>Telecom Italia, SpA v. Wholesale Telecom Corp.</u>, 248 F.3d 1109, 1114 (11th Cir. 2001) ("Whether a party has agreed to arbitrate an issue is a matter of contract interpretation . . . .").

## I.

The alleged facts are that for twelve hours a day, seven days a week, Jane Doe[5] worked as a bar server on Princess Cruise Lines' M/S Star Princess. On June 20, 2009, in the early morning hours after she had worked a full shift serving drinks to passengers, Doe was returning to her cabin when a fellow crew member invited her to a birthday party. Some crew members gathered for the party in cabin number 3342, which is a double cabin with a bathroom in the middle. Because of that cabin's size, crew members often used it for parties. Those who

---

[5]The plaintiff is using the pseudonym "Jane Doe" to protect her confidentiality.

4

were there on that occasion included: Christopher Ugay, Ian Capito, Mark Anchuela, Lou Vivero, and Arnold de Vera. One of those men handed Doe an open beer and, not suspecting anything, she drank it. The beer contained a drug, which rendered her unconscious in the cabin with Ugay and the four other men.

When Doe came to later that morning, she was in one of the beds in cabin 3342. Someone had removed her pants and underwear, and she realized that she had been raped while she was unconscious. She also had a severe headache, was dizzy, disoriented, and weak, all of which are after-effects of a date rape drug.

Ugay was in the cabin when Doe awoke, and she asked him who had done this to her. He blamed Ian Capito. When Doe got back to her own cabin, she felt so sick and weak that she could not climb the ladder to her bunk and instead fell asleep on the floor. Her cabin mate awoke her later, and Doe returned to work early that afternoon. She felt so sick, however, that she had to go back to her cabin to sleep.

Doe returned to work the next morning, June 21, feeling "humiliated, ashamed, and traumatized" because she had been raped while unconscious in a cabin with five men. She could not recall how many men had participated in the rape or had watched it occur or whether any of them had taken photographs or a

5

video of her being assaulted.

Doe told her work supervisor that she had been raped while unconscious in cabin 3342. She wanted to report the rape to a personnel manager then so that she could ask permission to miss work and get medical treatment, but her supervisor refused to permit her to leave, telling her that she could wait until the next morning to report it. After she got off work the next morning, which was June 22, 2009, Doe went to the personnel manager and reported that she had been raped and explained the circumstances in which it had happened. The personnel manager told her to write a report and then go back to work.

That afternoon, Doe was interrogated by ship officers and required to repeatedly recount the details of the rape in the presence of male officers and supervisors. That same afternoon the cruise line had her prepare another statement and tape recorded her account. As a result Doe, who had not eaten all day, felt "weak and traumatized." She had not been given any medical attention.

Doe was finally allowed to go to the ship's infirmary on the afternoon of June 22, more than 24 hours after she had reported the rape. After examining her, the ship's doctor concluded that Doe had a torn labia, which could have been a result of "forced entry." The doctor drew blood and tested Doe's urine for the

presence of date rape drugs. The test was positive, although the ship doctor characterized the results as "'weak,'" which Doe asserts was attributable to the "length of time since the rape."[6]

On June 23, crew member Ugay admitted to "ship personnel" that he had engaged in "sex" with Doe while she was unconscious, and that he did so without using a condom. The ship's doctor reported in Doe's medical records that she had been raped, but the doctor did not administer anti-retroviral medication in order to counteract the risk of HIV/AIDS or other sexually transmitted diseases. The ship's officers and officials did not allow Doe to disembark for emergency medical treatment in a United States port. Instead, she was instructed to return to work. By the time she was finally allowed off the ship and was treated at a hospital's sexual assault center in Seattle on July 13, 2009, more than three weeks after the rape, it was too late for antiretroviral treatment.

The cruise line did report the incident to the FBI, and agents boarded the ship but they did not arrest anyone. That often happens, Doe alleges, when crimes

_____

[6]According to Doe, the presence of date rape drugs is not detectable for very long: Rohypnol for 72 hours and GHB for only 12 hours. Doe alleges that the rape occurred in the early morning hours of June 20, and she did not receive medical attention from the ship's doctor until the afternoon of June 22, more than 48 hours after the rape.

are committed on foreign flagged cruise ships by one or more foreign nationals (Ugay is Filipino) against another foreign national (Doe is Russian).[7] Doe's medical records with the cruise line note that her blood and rape kit samples were then destroyed by dumping them in the incinerator: "29 June 09 17:00 FBI/Bermuda: no case to be made. All forensic evidence taken in waste bags to incinerator." The cruise line did fire Ugay, after he admitted to "engaging in sex" with Doe while she was unconscious, and then it flew him back to the Phillipines. It allowed the other four crew members, who had been in the cabin at the time and may also have raped Doe, to keep their jobs.

After Doe reported that she had been raped, an official from the cruise line told her that she could not leave the ship at a United States port to receive medical treatment or counseling. She had, she was told, only two options: She could go to a clinic in Alaska and return immediately to work, or she could return to Russia. Even though she had a valid tourist visa, a representative of the cruise line told Doe that immigration officials would not allow her to enter the United States for medical treatment. No one from the cruise line informed Doe about her rights as a

---

[7]Salvador Hernandez, Deputy Assistant Director of the FBI, testified before Congress in 2007 that the majority of cruise ship sexual assault cases are not prosecuted. Crimes Against Americans on Cruise Ships: Hearing Before the Subcomm. on Coast Guard and Mar. Transp. of the H. Comm. on Transp. and Infrastructure, 110th Cong. 12 (2007) (statement of Hernandez, Deputy Assistant Director of the FBI).

seaman, allegedly "including the right to obtain medical treatment and counseling ashore in the U.S. and the right to choose her own doctors and receive maintenance and cure until she recovered from the trauma."

Seeking advice about her legal rights, Doe emailed James Walker, an attorney in Florida, about her plight. On July 2, 2009, Walker communicated by email and fax with the cruise line's general counsel, Mona Ehrenreich. He told Ehrenreich that he represented Doe, who wanted to leave the ship immediately to get emergency medical treatment, antiretroviral medication, and counseling. Ehrenreich's secretary left a message on Walker's answering machine, stating that the cruise line would respond to Doe's request in the next four or five days.

That same day Walker replied to the message from Ehrenreich's secretary. He emailed and faxed Ehrenreich that any delay in addressing the matter was "unacceptable," and he told her that Doe would "be disembarking the cruise ship once it arrives in Seattle" to obtain "medical and psychological treatment." Walker also informed Ehrenreich that he would be flying from Miami to Seattle to meet with Doe and to ensure that she received emergency medical treatment and counseling. Ehrenreich responded by telling Walker that the situation was not an emergency and that Doe's only option was to leave the ship and return to Russia.

The next day, July 3, 2009, Walker emailed and faxed Ehrenreich again, warning her that if the cruise line "refuse[d] to permit [Doe] to leave the cruise ship for medical reasons on Sunday morning [July 6, 2009], we will consider this conduct to constitute false imprisonment."

At some point, Doe personally asked officers or agents of the cruise line who were on the ship to help her get medical treatment in Seattle. They responded by berating her, interrogating her again, and attempting to force her to choose between remaining on the ship or going back to Russia. They told her she had no other options.

On July 3, 2009, Walker contacted the Russian Embassy in Washington D.C. and the Russian Consulate in Seattle. The Consulate agreed to send a representative to meet Walker at the port in case officers on board prohibited Doe from leaving the ship. On July 4, 2009, Ehrenreich informed Walker that he could not see or speak to Doe and that she would not be permitted to leave the ship. Doe was told the same thing and was required to continue working. Doe did get off the ship in Seattle but only after the representative of the Russian Consulate went on board, spoke with Doe, and then escorted her off.

In Seattle Doe met with immigration officials of this country, who granted

her a medical parole so that she could receive treatment and counseling at a rape crisis facility in the United States. Even so, someone from the cruise line reported to immigration officials that Doe was absent from the ship without leave, allegedly "in an effort to have her arrested and deported." Meanwhile, representatives from the cruise line's claims department tried to talk with Doe without her lawyer being present. Despite the cruise line's obligation to provide Doe with maintenance and cure, its officials refused to provide her with food and delayed paying for her Seattle hotel for two months.

On August 31, 2009, the cruise line flew Doe back to Russia. It did not provide her with money, food, or transportation from the Russian airport to her home. And it did not arrange for medical treatment or counseling in Russia. After Walker demanded that the cruise line provide maintenance and cure, Ehrenreich informed Walker that Doe was required to report directly to the cruise line's agent in Switzerland, who handles those matters. But someone from the cruise line instructed that agent to refuse to provide maintenance and cure, and the agent followed those instructions. As of the date Doe's first amended complaint in this case was filed on October 8, 2009, Princess Cruise Lines had not provided Doe with any maintenance and cure after she was sent to Russia—no medical care

11

or treatment, no counseling, no assistance of any kind.

II.

In her first amended complaint, which is the relevant one for purposes of this appeal, Doe asserted ten claims against Princess Cruise Lines. The first five of those claims fall under either the Jones Act, 46 U.S.C. § 30104, or the general maritime law applicable to seamen, or the Seaman's Wage Act, 46 U.S.C. § 10313. Those claims are: (1) a "Jones Act negligence" claim, alleging that Princess Cruise Lines breached its "duty to provide a safe place to work such that [Doe] could perform the job obligations in a reasonably safe manner and live aboard the vessel free from sexual violence and/or sexual harassment"; (2) an unseaworthiness claim, alleging that the cruise line breached its "non-delegable duty to provide [Doe] with a seaworthy vessel upon which to work and live free from sexual battery and/or sexual harassment"; (3) a Jones Act claim, alleging that the cruise line breached its duty under that act to provide Doe with prompt, adequate, and complete medical treatment for "injuries sustained while in the service of the vessel"; (4) a maintenance and cure claim, alleging that the cruise line "purposefully refused to arrange for and pay [for] timely and complete medical cure" despite its obligation to do so under "the General Maritime Law";

12

and (5) a Seaman's Wage Act claim that the cruise line breached its "duty to timely pay all of [Doe's] wages as a seaman."  Those claims are contained, in that order, in Counts I–V of the complaint.[8]

The remaining five claims that Doe asserted against Princess Cruise Lines are common law tort claims :  (6) a false imprisonment claim, alleging that the cruise line had "purposefully and intentionally restrained [Doe] against her will on the cruise ship and did not permit her to leave the cruise ship to go ashore for medical treatment" in Seattle; (7) an intentional infliction of emotional distress claim, alleging "separate and independent torts committed by" the cruise line, its agents, and its employees related to Doe's rape and the way that they handled the situation and treated her after learning of the rape; (8) a spoliation of evidence claim, alleging that the cruise line breached its duty to preserve evidence after one of its crew members sexually assaulted and battered Doe; (9) an invasion of privacy claim, alleging that the cruise line, though its agents, breached its duty to protect Doe's confidentiality and privacy as a rape victim by repeatedly disclosing her real name in an effort to intimidate and embarrass her; and (10) a fraudulent misrepresentation claim, alleging that officers of the cruise line who were on the

---

[8]Count IV, a claim alleging a breach by Princess Cruise Lines of its duty to provide Doe with maintenance and cure, is misnumbered as Count V in the complaint, resulting in two Count V's.  In order to avoid confusion, we will refer to it throughout this opinion as Count IV.

ship repeatedly and falsely told Doe after she had been drugged and raped that she could not disembark the ship to get medical treatment and counseling by doctors of her own choosing. Those claims are, in that order, contained in Counts VI–X of the complaint.

Princess Cruise Lines filed a motion to compel arbitration of all ten counts of the complaint. The district court denied that motion in its entirety. Finding no binding authority on point, the district court was persuaded by the decision in Jones v. Halliburton, 583 F.3d 228 (5th Cir. 2009). The Fifth Circuit held in Jones that some of the claims arising from the sexual assault of the plaintiff were outside the scope an arbitration provision that covered claims "related to" her employment. Id. at 239. The district court found that the alleged facts of this case were quite similar to those in the Jones case. It recounted how: "All of the facts important to the Jones decision are present here: the rape occurred at an after-hours party, in a crew member's stateroom, while Plaintiff was off-duty, following a social gathering, in a place removed from Plaintiff's working location, and where guests were not allowed." The district court reasoned that Doe's "[b]eing drugged and raped at an after-hours party in a crewmember's stateroom does not relate to, arise out of, or have a connection with the crew agreement, the

14

employment terms, or the services [plaintiff] performed for [the cruise line]," as it would have to in order to be within the scope of the arbitration agreement between the parties. For those reasons, the court ruled that the dispute between Doe and Princess Cruise Lines was beyond the scope of the arbitration provision in the crew agreement.

The cruise line filed a motion for reconsideration, which the district court denied. Doe v. Princess Cruise Lines, Ltd., 696 F. Supp. 2d 1282, 1289 (S.D. Fla. 2010). In doing so, the court explained that "even though some of Plaintiff's legal causes of action depend on her status as a seaman, the facts as pled demonstrate that the dispute did not arise out of her employment." Id. at 1288. This is the cruise line's appeal from the order denying its motion to compel arbitration.

III.

Princess Cruise Lines contends that we should reverse the district court's denial of its motion to compel arbitration for two reasons. One of those reasons is its contention that the district court should not have decided the arbitrability issue but instead should have sent that issue, along with the others, to an arbitrator for

decision. This contention is a non-starter because, as the cruise line concedes, it asked the district court to decide for itself whether the dispute was subject to arbitration. Only when the matter was illuminated by the light of an unfavorable decision from the district court did the cruise line suddenly see that the court ought not have answered the question after all.

The invited error doctrine stands for the common sense proposition that someone who invites a court down the primrose path to error should not be heard to complain that the court accepted its invitation and went down that path. See, e.g., Birmingham Steel Corp. v. Tenn. Valley Auth., 353 F.3d 1331, 1341 n.5 (11th Cir. 2003) ("It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party. " (quotation marks omitted)). And, in any event, the path down which the cruise line invited the court did not lead to error. Determining the scope of an arbitration provision "falls within the category of 'gateway matters' which the Supreme Court has instructed us that courts and not arbitrators should decide." Anders v. Hometown Mortg. Servs., Inc., 346 F.3d 1024, 1027 (11th Cir. 2003) (citing Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452, 123 S.Ct. 2402, 2407 (2003) (holding that courts must decide "certain gateway matters, such as whether the

parties have a valid arbitration agreement at all or whether a concededly binding

arbitration clause applies to a certain type of controversy")).

IV.

Princess Cruise Lines' primary contention is that all of Doe's claims fall

within the scope of the arbitration provision because, contrary to what the district

court decided, all of them are related to, arose out of, or were connected with

Doe's employment duties as specified by her crew agreement. That contention

turns on interpretation of the arbitration provision, which is a matter that we

decide de novo. Wheat, First Sec., Inc. v. Green, 993 F.2d 814, 817 (11th Cir.

1993) ("Determinations of arbitrability, like the interpretation of any contractual

provision, are subject to de novo review.") (quotation marks omitted).

A.

"The [Federal] Arbitration Act establishes that, as a matter of federal law,

any doubts concerning the scope of arbitrable issues should be resolved in favor of

arbitration . . . ."[9] Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S.

---

[9]International arbitration agreements, like the one in this case, are subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208, which is incorporated in and enforced through the FAA. See Thomas v. Carnival Corp., 573 F.3d 1113, 1116 (11th Cir. 2009) ("The United States, as a signatory to the Convention, enforces this treaty through Chapter 2 of the U.S. Federal Arbitration Act (FAA), which incorporates the terms of the Convention . . . ."). "Section 1 of the Federal Arbitration Act (FAA or Act) excludes from the Act's coverage 'contracts of employment of seamen, railroad

17

1, 24–25, 103 S.Ct. 927, 941 (1983). "Because the FAA is at bottom a policy guaranteeing the enforcement of private contractual arrangements, we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294, 122 S.Ct. 754, 764 (2002) (citation and quotation marks omitted). Even though there is that presumption in favor of arbitration, "[t]he courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties." Goldberg v. Bear, Stearns & Co., 912 F.2d 1418, 1419–20 (11th Cir. 1990). That means "the parties will not be required to arbitrate when they have not agreed to do so." Id. at 1419; see also Waffle House, 534 U.S. at 294, 122 S.Ct. at 764 ("Arbitration under the FAA is a matter of consent, not coercion." (quotation marks and alteration omitted)); Telecom Italia, 248 F.3d at 1114 ("'[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" (quoting United

employees, or any other class of workers engaged in foreign or interstate commerce.'" Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 109, 121 S.Ct. 1302, 1306 (2001) (quoting 9 U.S.C. § 1). The Convention, however, "precludes application of the exemption for seamen's employment agreements set forth in 9 U.S.C. § 1." Bautista v. Star Cruises, 396 F.3d 1289, 1303 (11th Cir. 2005). Under both the FAA and the Convention "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate" it. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 3353 (1985). That is the issue we must resolve in this case, and FAA principles guide the analysis. See id., 105 S.Ct. at 3353.

18

Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80

S.Ct. 1347, 1353 (1960))).

B.

The contractual agreement that Doe signed when she went to work for

Princess Cruise Lines, which is titled "Acceptance of Employment Terms and

Conditions," contains the following provision, which is itself titled "Arbitration

Notice & Agreement":

> As provided by the Principal Terms and Conditions of Employment, which are deemed to be incorporated herein by reference, the Company and I hereby acknowledge and agree that my employment with the Company constitutes an international commercial relationship between foreign parties, and we agree that any and all disputes shall be referred to and resolved by binding arbitration as provided for in the Principal Terms and Conditions of Employment.

As that provision indicates, the "Acceptance of Employment Terms and

Conditions" incorporates a document called the "Principal Terms and Conditions

of Employment." The "Crew Agreement" incorporates by reference both the

Acceptance of Employment Terms and Conditions and the Principal Terms and

Conditions of Employment. The arbitration provision is contained in a section of

the Principal Terms and Conditions of Employment that is titled "Governing Law,

Arbitration, Venue and Examinations." (That whole section, unlike the rest of the

19

agreement, appears in all capital letters.)  The arbitration provision in it states:

> . . . [T]he Company and crew member agree that <u>any and all disputes, claims, or controversies whatsoever</u> (whether in contract, regulatory, tort or otherwise and whether pre-existing, present or future and including constitutional, statutory, common law, admiralty, intentional tort and equitable claims) <u>relating to or in any way arising out of or connected with the Crew Agreement, these terms, or services performed for the Company</u>, including but not limited to wage and benefit matters, employment applications, wrongful termination or discrimination claims, property loss or damage, <u>personal injury</u>, death or any other claim, no matter how described, pleaded or styled [collectively, "Disputes"] between the crew member and the Company or others, including against the master, shipowner, vessel, vessel operator, charterer, or any other third party, including also, but not limited to, Princess Cruises, P&O Cruises Australia, and Cunard Line, <u>shall be referred to and resolved exclusively by binding arbitration</u> . . . .

(capitalization altered; brackets in original; emphasis added)  Doe admits that she signed the Acceptance of Employment Terms and Conditions document which incorporates by reference that arbitration provision as set forth in the Principal Terms and Conditions of Employment.

C.

As the district court recognized, the Fifth Circuit's <u>Jones</u> case involved an arbitration provision and factual allegations similar to those in the present case. <u>See</u> <u>Jones</u>, 583 F.3d 228.  For that reason, and because it is the only published federal court of appeals decision on point that the parties have directed us to or

that we could find, we will consider the facts of the Jones case in some detail.[10]

Jamie Leigh Jones went to work for Halliburton as an administrative assistant in Houston, Texas. Id. at 230. She asked to be transferred because she was allegedly being sexually harassed by her supervisor, and later she signed a contract to serve as a clerical worker for a Halliburton subsidiary in Baghdad, Iraq. Id. at 230–31. The agreement she signed included a provision stating that any claim she might have against her employer that was "related to [her] employment," including a "personal injury claim arising in the workplace" would be subject to arbitration. Id. at 231 (alteration omitted). An incorporated agreement referred to and swept into the arbitration clause any claims of "personal injury allegedly incurred in or about a Company workplace." Id.

Jones' job assignment was in "the Green Zone" in Baghdad, which "is a ten-square-kilometer area that was initially the center of the Coalition Provisional Authority after the Iraqi invasion, and continues to remain the center of the

---

[10]Princess Cruise Lines relies on Doe v. Royal Caribbean Cruises, Ltd., 180 Fed. App'x 893 (11th Cir. 2006) (unpublished), which held "that the District Court did not err in compelling arbitration in the Philippines because there was an enforceable arbitration agreement between the parties, and it is not apparent that Doe is precluded from having her claims arbitrated in the Philippines." Id. at 894. The cruise line's reliance fails. That opinion contains no factual details and no discussion of the scope of the arbitration provision, and we are not bound by this Court's unpublished decisions anyway. See 11th Cir. R. 36–2; see also Bravo v. United States, 532 F.3d 1154, 1163 n.5 (11th Cir. 2008).

21

international presence in the city." Id. Housing was provided there as part of her employment agreement, and Jones was assigned to barracks that were located "some distance from her workplace." Id. Despite her earlier request for private lodging in an area shared only with other women, she was assigned to live in barracks that were occupied mostly by men. Id. Two days after she arrived, she complained about a "sexually-hostile living environment" and asked to be housed in a safer location. Id.

The next night, after a social gathering outside her barracks where people were drinking alcohol, Jones was allegedly drugged, beaten, and gang raped by several co-workers in her barracks bedroom. Id. Similar to Doe's experience in the present case, Jones woke up without her clothes on, and one of the perpetrators was lying in a lower bunk. Id. He allegedly admitted to having engaged in "unprotected sex" with her. Id. Also similar to the present case, Jones sustained physical injuries. See id. at 231–32. Yet another similarity is that Halliburton allegedly mishandled Jones' rape kit and did not permit her to leave the premises, despite her request to do so. Id. at 232. Jones, like Doe, asserted that company officials interrogated her for several hours. Id. With congressional assistance, Jones' father eventually secured her return to the United States. Id. Arguably

22

unlike Doe, "Jones was not continuously on call" during her employment.[11]  Id. at 239.  In any event, neither Jones nor Doe was "on duty" when the rape occurred.  See id.

The district court in the Jones case denied Halliburton's motion to compel arbitration on four of Jones' claims:  assault and battery; intentional infliction of emotional distress arising from the alleged assault; negligent hiring, retention, and supervision of employees involved in the alleged assault; and false imprisonment.[12]  Id. at 233.  It held that those claims were related to the alleged rape and were not related to Jones' employment, so they were beyond the scope of her arbitration provision.  Id.  It reasoned that even though Jones' housing was provided to her by her employer, her bedroom was not her workplace.  Id.

The Fifth Circuit agreed.  It summarized the factual allegations in the case

_____

[11]Princess Cruise Lines asserts that Doe was continuously on call because the crew agreement provided:  "All crew members agree to work any hours necessary in case of emergency directly affecting the immediate safety or security of the vessel, passengers and crew, of which the Captain shall be the sole judge . . . ."  But it is undisputed that Doe was off duty when the rape occurred.

[12]The district court granted Halliburton's motion to compel arbitration of Jones' other claims, which were apparently based on the same facts but were claims for:  negligent undertaking, sexual harassment and hostile work environment under Title VII, retaliation, breach of contract, fraud in the inducement to enter the employment contract, and fraud in the inducement to agree to arbitration.  Id. at 232.  It stayed litigation of the non-arbitrable claims so that the parties could complete arbitration of the arbitrable ones.  Jones v. Halliburton Co., 625 F. Supp. 2d 339, 342 (S.D. Tex. 2008).  Apparently, Jones did not cross-appeal the part of the judgment compelling arbitration on those claims.  See generally Jones, 583 F.3d 228.

23

before it as follows:

> (1) Jones was sexually assaulted by several Halliburton/KBR
> employees in her bedroom, after-hours, (2) while she was off-duty,
> (3) following a social gathering outside of her barracks, (4) which
> was some distance from where she worked, (5) at which social
> gathering several co-workers had been drinking (which, notably, at
> the time was only allowed in 'non-work' spaces).

Id. at 240. The court reasoned:

> [I]f non-Halliburton/KBR employees were allowed in the area where
> the alleged assault occurred, and Halliburton/KBR employees had
> assaulted such a non-employee, that person obviously would have an
> actionable claim. That Jones was the victim in the alleged assault,
> and that she happened to be a co-worker of the alleged perpetrators,
> should not, and does not, change the calculus.

Id. The court held that, in light of Jones' claims and her factual allegations, "the outer limits of the 'related to' language of the arbitration provision have been tested, and breached." Id. at 241. The court refused to interpret the scope of the arbitration provision "so broadly as to encompass any claim related to Jones' employer, or any incident that happened during her employment" because "that is not the language of the contract." Id. (emphasis omitted).

### D.

Princess Cruise Lines tries to sweep all of Doe's claims into the scope of the arbitration provision by focusing on the differences between life at sea and life on

land.  It points to a Supreme Court opinion discussing those differences in the context of an employer's liability for providing maintenance and cure to seamen:

> Unlike men employed in service on land, the seaman, when he finishes his day's work, is neither relieved of obligations to his employer nor wholly free to dispose of his leisure as he sees fit.  Of necessity, during the voyage he must eat, drink, lodge and divert himself within the confines of the ship.  In short, during the period of his tenure the vessel is not merely his place of employment; it is the frame-work of his existence.  For that reason among others his employer's responsibility for maintenance and cure extends beyond injuries sustained because of, or while engaged in, activities required by his employment.  In this respect it is a broader liability than that imposed by modern workmen's compensation statutes.

Aguilar v. Standard Oil Co. of N.J., 318 U.S. 724, 731–32, 63 S.Ct. 930, 934 (1943) (citations omitted).  The cruise line argues that the Fifth Circuit's Jones decision is distinguishable from the present case based on the fact that the ship is the very "framework" of the seaman's existence and unlike Jones, Doe was "continually in the service of the vessel and subject to the call of duty at any time" simply by virtue of being a seaman.  That argument reaches too far and would effectively erase the arbitration provision's limiting language.

Under the cruise line's position, any claim that Doe had against her employer would be subject to arbitration because the ship was the "frame-work of [her] existence," and everything she did related to, arose from, or was connected

25

with her crew agreement or the services she performed for the cruise line. In making the argument that the ship was Doe's whole world and that everything about it related to her employment, the cruise line relies on a number of decisions that define and describe "scope of employment" for purposes of the remedies of worker's compensation or maintenance and cure. See, e.g., Flores v. Carnival Cruise Lines, 47 F.3d 1120, 1123 (11th Cir. 1995) ("The Supreme Court has repeatedly declared that the shipowner's liability for maintenance and cure was among the most pervasive of all and that it was not to be defeated by restrictive distinctions nor narrowly confined.") (quotation marks omitted). The FAA similarly requires expansive interpretation of arbitration agreements, see, e.g., Waffle House, 534 U.S. at 289, 122 S.Ct. at 762 (referring to the "'liberal federal policy favoring arbitration agreements'" (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25, 111 S.Ct. 1647, 1651 (1991))), but not at the expense of limiting language in contracts, see id. ("Absent some ambiguity in the agreement, however, it is the language of the contract that defines the scope of disputes subject to arbitration."). In the present case, the plain language of the arbitration provision imposes the limitation that, to be arbitrable, the dispute between Doe and the cruise line must relate to, arise from, or be connected with

26

her crew agreement or the employment services that she performed for the cruise line.  The arbitration provision is broad, but not limitless.

If the cruise line had wanted a broader arbitration provision, it should have left the scope of it at "any and all disputes, claims, or controversies whatsoever" instead of including the limitation that narrowed the scope to only those disputes, claims, or controversies "relating to or in any way arising out of or connected with the Crew Agreement, these terms, or services performed for the Company."  That would have done it, but the company did not do that.   Instead, after including that limiting language, it now argues that we should ignore the limitation and force Doe to arbitrate any and all disputes, claims, or controversies without regard to whether they relate to, arise out of, or are connected with her employment or her service as an employee.   That we cannot do.  See Becker v. Davis, 491 F.3d 1292, 1298 (11th Cir. 2007), abrogated on other grounds by Arthur Andersen LLP v. Carlisle, — U.S. —, 129 S.Ct. 1896 (2009), as recognized by Lawson v. Life of the South Ins. Co., — F.3d —, No. 10-11651, 2011 WL 3476876, *4 (11th Cir. Aug. 10, 2011) ("A party cannot be forced to arbitrate any dispute that the party has not agreed to submit to arbitration.").  If the language about employment and services as an employee did not limit the scope of the arbitration provision, it

27

would have no purpose, and that is an interpretative no-no.  See Golden Door

Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n, 117 F.3d 1328,

1338 (11th Cir. 1997) ("[A]n interpretation which gives a reasonable meaning to

all provisions of a contract is preferred to one which leaves a part useless or

inexplicable." (internal marks and citation omitted)); Restatement (Second) of

Contracts § 203(a) (1981) ("An interpretation which gives a reasonable, lawful,

and effective meaning to all the terms is preferred to an interpretation which

leaves a part unreasonable, unlawful, or of no effect."); see also In re Hedrick, 524

F.3d 1175, 1189 (11th Cir. 2008) (stating that a statutory interpretation that

"renders one provision superfluous . . . is an interpretative no-no").

Contrary to Princess Cruise Lines' position, the terms used in the limiting

language are not unlimited in scope.  The term "arising out of" is broad, but it is

not all encompassing.  In construing that same term to determine whether a dispute

arises out of a contract, we have explained that the focus is on "whether the tort or

breach in question was an immediate, foreseeable result of the performance of

contractual duties."  Telecom Italia, 248 F.3d at 1116; see also Hemispherx, 553

F.3d at 1367 ("We have previously focused on foreseeability as [the] proper

standard for resolving the scope of an arbitration clause that covers disputes

28

'arising out of or pursuant to' the contract between the parties."). "Arising out of" requires the existence of some direct relationship between the dispute and the performance of duties specified by the contract. See Telecom Italia, 248 F.3d at 1116 ("Disputes that are not related—with at least some directness—to performance of duties specified by the contract do not count as disputes 'arising out of' the contract, and are not covered by the standard arbitration clause.").

Similarly, "related to" marks a boundary by indicating some direct relationship; otherwise, the term would stretch to the horizon and beyond. As the Supreme Court has explained in the ERISA pre-emption context, "related to" is limiting language and "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy," it would have no limiting purpose because "really, universally, relations stop nowhere." N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655, 115 S.Ct. 1671, 1677 (1995) (quotation marks omitted). The same rationale applies here.

"Connected with" also connotes the necessity of some direct connection; if it did not, the term would be meaningless. Cf. Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 93 F.3d 1572, 1578 (Fed. Cir. 1996) (construing a patent claim and stating that "[i]f, as Ethicon argues, 'connected to' should be read broadly to

29

include elements which are connected directly or indirectly, then . . . the 'connected to' limitation would be meaninglessly empty").

E.

Applying our interpretation of the arbitration provision to the allegations, claims, and counts of the amended complaint leads us to conclude that some of them are within the scope of the arbitration provision, and some of them are not. Counts VI, VII, VIII, IX, and X of Doe's complaint contain allegations and claims that do not arise from, do not relate to, and are not connected with the parties' crew agreement or the services that Doe performed for Princess Cruise Lines. Count VI, a claim for false imprisonment, is based on the allegation that officers of the cruise ship would not permit Doe to leave the ship and go ashore to get medical treatment after she was raped. Count VII, a claim for intentional infliction of emotional distress, is based on allegations that a crew member drugged and raped Doe as well as allegations about the cruise line's actions after the rape, including its refusal to allow Doe to receive prompt and adequate medical care and its interrogation and intimidation of Doe. Count VIII, a claim of spoliation of evidence, is based on the allegation that the cruise line breached its duty to preserve evidence after Doe was raped. Count IX, a claim of invasion of privacy,

30

is based on the allegation that cruise line officials breached their duty to protect Doe's confidentiality and privacy as a rape victim by disclosing her real name in an effort to intimidate and embarrass her. Count X, a claim of fraudulent misrepresentation, is based on allegations that officers of the cruise line who were on the ship repeatedly and falsely told Doe after she had been drugged and raped that she could not disembark the ship to get medical treatment and counseling by doctors of her own choosing.

All five of those claims involve factual allegations about how the cruise line and its officials treated Doe after learning that she had been raped, including allegations that she was kept on the ship against her will, that she was prevented from getting medical attention off the ship, that her rape kit was destroyed in the incinerator, and that her confidentiality as a rape victim was intentionally violated. Nothing about those allegations relate to, arise out of, or are connected with Doe's crew agreement or her duties for Princess Cruise Lines as a bar server. The cruise line could have engaged in that tortious conduct even in the absence of any contractual or employment relationship with Doe. As a result, those five claims are not "an immediate, foreseeable result of the performance" of the parties' contractual duties or Doe's services as a Princess Cruise Lines employee, and they

31

are not within the scope of the arbitration clause.  <u>Hemispherx</u>, 553 F.3d at 1367.

The incidental fact that Doe might not have been on the cruise ship if she had not been working for the cruise line does not mean that her claims relate to, arise from, or are connected with the crew agreement and the services that she performed as an employee.  The parties could each have fulfilled all of their duties under the crew agreement and Doe could have perfectly performed her services for the cruise line, and the parties still be embroiled in the dispute alleged in Doe's common law claims, which are counts VI though X of her complaint.  <u>See</u> <u>id.</u> at 1368–69 ("The parties could have performed the arbitrable contract perfectly, fulfilling all expectations under that contract, and still be embroiled in this dispute.") (quotation marks omitted).  By way of illustration, a passenger could have brought these same five claims against the cruise line based on virtually the same alleged facts:  a crew member invited the passenger to a crew party in a cabin; the crew member gave the passenger an open beer that turned out to contain a date rape drug; the passenger woke up in the crew cabin and realized she had been raped; cruise line officials treated the passenger with contempt, delayed her attempt to report of the rape, would not let her leave the ship, and otherwise hindered her efforts to meet with an attorney and to get medical treatment onshore.

See Jones, 583 F.3d at 240 ("Moreover, if non-Halliburton/KBR employees were allowed in the area where the alleged assault occurred, and Halliburton/KBR employees had assaulted such a non-employee, that person obviously would have an actionable claim. That [the plaintiff] was the victim in the alleged assault, and that she happened to be a co-worker of the alleged perpetrators, should not, and does not, change the calculus."). For these reasons, the district court did not err in holding that Counts VI, VII, VIII, IX, and X of Doe's complaint do not fall within the scope of the arbitration provision.

F.

The allegations and claims in Doe's five other counts, however, arise directly from her undisputed status as a "seaman" employed by Princess Cruise Lines.[13] Counts I and III specifically refer to Princess Cruise Lines' duties under

---

[13]We choose to say "allegations and claims" even though there is language in at least one of our opinions stating that "[w]hether a claim falls within the scope of an arbitration agreement turns on the factual allegations in the complaint rather than the legal causes of action asserted." Gregory v. Electro-Mech. Corp., 83 F.3d 382, 384 (11th Cir. 1996). What the Gregory decision actually held, however, was that a plaintiff cannot disguise an arbitrable breach of contract claim by slapping a tort claim label on it. See id. at 384 (explaining that the so-called tort claims in the plaintiff's complaint were all based on facts alleging that the defendants had breached the contract); see also Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd., 1 F.3d 639, 643 (7th Cir. 1993) ("[A] party may not avoid a contractual arbitration clause merely by casting its complaint in tort.") (quotation marks omitted) cited with approval in Gregory, 83 F.3d at 384. Gregory did not hold that it makes no difference what cause of action is asserted. In analyzing the scope of an arbitration clause, we consider how the factual allegations in the complaint match up with the causes of action asserted and measure that against the language of the arbitration clause. See Mitsubishi Motors Corp., 473 U.S. at 626, 105 S.Ct. at 3353 (explaining that "the

33

the Jones Act, 46 U.S.C. § 30104, alleging as a fact that those duties were breached. See O'Boyle v. United States, 993 F.2d 211, 213 (11th Cir. 1993) ("[I]n order to recover damages under the Jones Act, [a plaintiff] must have the status of a seaman."); Hurst v. Pilings & Structures, Inc., 896 F.2d 504, 505 (11th Cir. 1990) ("The Jones Act permits a seaman injured in the course of employment to bring an action against his employer for damages."). Count II is based on an assertion of "unseaworthiness," which is dependent upon Doe's status as a seaman. See Offshore Co. v. Robison, 266 F.2d 769, 781 (5th Cir. 1959) ("The admiralty doctrine of absolute liability for unseaworthiness is based on protection of seamen who sign articles for a voyage and are then under the absolute control of a master with power to order seamen to do the ship's work in any weather, under any conditions, using such equipment as may be furnished by the shipowner."); see also Flores, 47 F.3d at 1123 n.2 ("In addition to the right of maintenance and cure, an injured seaman has two other possible avenues of recovery for an injury: (1) an action under general maritime law for unseaworthiness; and (2) a statutory remedy under the Jones Act for any breach of

---

first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate" it).

34

the employer's duty, including negligence.") (citation omitted).  Count IV is based on Doe's entitlement to maintenance and cure, which is a traditional maritime law remedy for seamen.  See Flores, 47 F.3d at 1123 n.2; see also Thomas v. Carnival Corp., 573 F.3d 1113, 1115 n.2 (11th Cir. 2009).  Count V is brought under the Seaman's Wage Act and is dependent on her status as a seaman.  See 46 U.S.C. § 10313.

All five of these claims are based on allegations that are dependent on her status as a seaman employed by the cruise line and the rights that she derives from that employment status.  Although the rape and its aftermath led to these five claims against the cruise line, Doe could not bring them if she had not been a seaman and she was a seaman because of her employment with Princess Cruise Lines.  These claims are based on the employment relationship between the parties, and if Princess Cruise Lines had fully complied with its alleged duties as a maritime employer, the claims would not exist.  Cf. Gregory, 83 F.3d at 384 ("If the buyer had fully complied with the contract, as interpreted by the plaintiffs, there would be no tort claims.").  By way of contrast, a non-seaman passenger who suffered exactly the same factual injuries could not bring any of these five claims against the cruise line regardless of how it had performed as an employer.

Because these five claims (counts I–V of the amended complaint) fall within the scope of the arbitration provision, the district court erred by denying Princess Cruise Lines' motion to compel arbitration on Counts I, II, III, IV, and V.

V.

For these reasons, we affirm the district court's judgment denying Princess Cruise Line's motion to compel arbitration on Counts VI, VII, VIII, IX, and X of Doe's complaint. We reverse the district court's judgment on Counts I, II, III, IV, and V of Doe's complaint and remand for proceedings consistent with this opinion.[14]

**AFFIRMED IN PART, REVERSED and REMANDED IN PART.**

---

[14]The district court has not yet addressed the issue of whether Thomas v. Carnival Corp., 573 F.3d 1113 (11th Cir. 2009), excludes from arbitration Counts I, II, III, IV, or V of Doe's complaint. For that reason, we have no occasion to decide that issue in this appeal. See, e.g., Pacheco de Perez v. AT&T Co., 139 F.3d 1368, 1372 n.5 (11th Cir. 1998) ("We are mindful of the general rule that a court of appeals will not consider issues not reached by the district court . . . ."). We imply no view about the issue, except to note that Thomas has recently been interpreted narrowly in light of prior precedent. See Lindo v. NCL (Bahamas), Ltd., No. 10-10367, — F.3d —, 2011 WL 3795234, at *19 (11th Cir. Aug. 29, 2011) ("[T]o the extent Thomas allowed the plaintiff seaman to prevail on a new public policy defense under Article II, Thomas violates Bautista [v. Star Cruises, 396 F.3d 1289 (11th Cir. 2005)] and our prior panel precedent rule.").