[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14206

_____

RYAN MAUNES MAGLANA,
 on his own behalf and as a class representatives
of all other similarly situated Filipino crewmembers
trapped aboard CELEBRITY cruise vessels,
FRANCIS KARL BUGAYONG,
on his own behalf and as a class representatives
of all other similarly situated Filipino crewmembers
trapped aboard CELEBRITY cruise vessels,

Plaintiffs-Appellants,

versus

CELEBRITY CRUISES, INC.,

Defendant-Appellee.

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-22133-JEM

———————————————

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

PER CURIAM:

Ryan Maunes Maglana and Francis Karl Bugayong were working onboard Celebrity Cruises, Inc.'s *Millennium* cruise ship in early 2020 when the COVID-19 pandemic severely disrupted lives around the world. Celebrity stopped carrying passengers but forced its crews to remain on its ships. It kept Maglana and Bugayong onboard even after terminating their employment for cause on March 30, 2020. Maglana and Bugayong sued for false imprisonment and intentional infliction of emotional distress based on the 58 days that they were confined on the *Millennium* from March 31 to May 26, 2020.

Celebrity moved to compel arbitration because Maglana and Bugayong had signed employment agreements in which they agreed to arbitrate all disputes arising from, related to, or connected with their employment. The district court granted Celebrity's motion to compel arbitration of their tort claims. But our precedent holds that intentional torts like those alleged here are outside the scope of arbitration agreements strikingly similar to the

agreements the plaintiffs signed. Thus, we reverse the district court's order compelling arbitration.

## I.    FACTS

Maglana and Bugayong (together, the "plaintiffs"), citizens of the Philippines, were employed stocking beverages as crewmembers of the Celebrity *Millennium* cruise ship. They allege, and Celebrity does not dispute, that the *Millennium* stopped carrying passengers on February 10, 2020. After being turned away from ports in Hong Kong and Thailand, the ship let its passengers off in Singapore as fears of the novel coronavirus spread throughout the world.

Later that month, the *Millennium* arrived in the Philippines. Although the plaintiffs and other Filipino crewmembers sought to disembark the passengerless ship, the only crewmembers allowed to leave were those who had both concluded their service contracts and had a suitable replacement to fill their roles onboard. Because the plaintiffs were still under contract, they remained onboard when the *Millennium* departed the Philippines the next day.

The ship next sailed to Hawaii, docking there for refueling on March 1. Still without passengers, it left Hawaii for Mexico without letting the plaintiffs disembark to return to the Philippines. Two days after the *Millennium* docked in Mexico, Celebrity's parent company, Royal Caribbean, suspended all of its future cruises, including the Celebrity line. The next day, March 14, the Centers for Disease Control and Prevention ("CDC") issued its first No Sail

Order, suspending cruise ship operations from United States ports. With no passenger cruises on the horizon for the foreseeable future, Celebrity allowed some crewmembers to disembark for repatriation and return to their home countries. It denied Maglana, Bugayong, and nearly 1,000 other Filipino crewmembers permission to do so. The *Millennium* docked in San Diego, California on March 20 and remained there as the weeks stretched on.

On March 30, Maglana took an expensive bottle of scotch from the ship's bar and shared it with Bugayong. Celebrity terminated their employment as a result. Under the employment agreements the plaintiffs had signed, discussed below, Celebrity should have repatriated them at their own expense. Instead, Celebrity forced Maglana and Bugayong, along with hundreds of other crewmembers, to remain on the ship. Aside from two "goodwill payment[s]" of $400 each, it did not pay the plaintiffs or other crewmembers wages for the time they were confined to the ship in San Diego. Doc. 28-2.[1]

The CDC on April 23 provided cruise lines with information on how to safely disembark their crewmembers and return them to their home countries. Cruise lines received permission from the CDC to disembark their crew after signing an attestation that they would comply with the CDC's safety requirements. The safety requirements prevented crewmembers from interacting with the public on their way home: meaning no flights through public

---

[1] "Doc." numbers refer to the district court's docket entries.

airport terminals, no rental cars or ride-share services, no overnight hotel stays, and no visits to restaurants.

The same day the CDC guidance was released, cruise lines began signing the attestation and repatriating crewmembers to their home countries. Over 100 groups of crewmembers, departing different ships and headed to different countries, had started the repatriation process before the *Millennium* made its first request for repatriation—of its Ukrainian and Romanian crew—on May 18. Other cruise lines had already begun to repatriate their Filipino crews.

Maglana, still aboard the ship, filed this action on May 21 in the United States District Court for the Southern District of Florida.[2] The complaint included articles from the *Miami Herald* and other news outlets detailing the desperate conditions of crewmembers kept aboard cruise ships. On behalf of a putative class of Filipino crewmembers for Celebrity, the complaint alleged claims of false imprisonment—forcing class members to remain on the ship—and intentional infliction of emotional distress—treating them "like cattle" and causing mental anguish.[3] Doc. 19 at 29. In addition to compensatory damages, the complaint sought an injunction to compel Celebrity to repatriate the Filipino crewmembers who remained on the ship. On May 26, a few days after the

---

[2] The amended complaint added Bugayong as a plaintiff.

[3] The complaint also included claims for employment discrimination and unpaid wages, which are not at issue in this appeal.

complaint was filed, Celebrity repatriated Maglana, Bugayong, and over 200 other Filipino crewmembers to the Philippines via charter flight.

Celebrity moved to dismiss the complaint and asked the district court to compel the parties to resolve their dispute through arbitration, which it argued was required by the plaintiffs' employment agreements. Maglana and Bugayong had signed a Sign-On Employment Agreement ("SOEA"), which incorporated Celebrity's Collective Bargaining Agreement ("CBA"). They also signed a Contract of Employment with the Philippine Overseas Employment Administration ("POEA"), which incorporated the POEA's Standard Terms and Conditions Governing Filipino Seafarers On Board Ocean-Going Vessels ("Standard Terms and Conditions"). We will refer to these agreements collectively as the "employment agreements."

The CBA and SOEA required "[a]ll grievances and any other dispute whatsoever, whether in contract, regulatory, statutory, common law, tort or otherwise relating to or in any way connected with the Seafarer's service" to be resolved by arbitration in the Philippines. Doc. 26-1 at 4. The SOEA also vested in the arbitrator exclusive authority to interpret the SOEA: "The arbitrator, and not any federal, state or local court or agency shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement . . . ." *Id.* at 5. The SOEA referred to the POEA's Contract of Employment to supply terms governing jurisdiction and venue.

The one-page POEA Contract incorporated the much longer Standard Terms and Conditions. Under the Standard Terms and Conditions, "[i]n cases of claims and disputes arising from this employment, the parties covered by a collective bargaining agreement shall submit the claim or dispute to the original and exclusive jurisdiction of the voluntary arbitrator or panel of voluntary arbitrators." Doc. 26-4 at 19. Maglana and Bugayong do not dispute that they signed and executed these employment agreements.

Before the district court, Maglana and Bugayong argued that, under the terms of the arbitration provisions in the employment agreements, their intentional tort claims were ineligible for arbitration because the claims did not "aris[e] from" or "relat[e] to" their employment relationship, nor were the claims "in any way connected with" their service on the cruise ship. *Id.*; Doc. 26-1 at 4. Applying a "but for" test to determine whether the claims were sufficiently tied to the employment relationship to trigger arbitration, the district court found that the plaintiffs' intentional tort claims would not be viable but for their service on the ship. The court concluded that the claims must be arbitrated, dismissed the complaint, and directed the parties to resolve their dispute in arbitration proceedings.

Maglana and Bugayong appeal the order compelling arbitration of the two intentional tort claims.

8                    Opinion of the Court                    20-14206

## II.    STANDARDS OF REVIEW

We review *de novo* a district court's order to compel arbitration. *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 (11th Cir. 2005). As relevant here, we review *de novo* the district court's interpretation of an arbitration clause to determine whether the allegations in the operative complaint fall within its scope. *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1208 (11th Cir. 2011).

## III.    ANALYSIS

A district court deciding a motion to compel arbitration conducts "a very limited inquiry."[4] *Bautista*, 396 F.3d at 1294 (internal quotation marks omitted). "[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate it." *Doe*, 657 F.3d at 1213 n.9 (internal quotation marks omitted). "[T]he parties will not be required to arbitrate when they have not agreed to do so." *Goldberg v. Bear, Stearns & Co.*, 912 F.2d 1418, 1419 (11th Cir. 1990). "Whether a party has agreed to arbitrate an issue is a matter of contract interpretation." *Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1114 (11th Cir. 2001) (internal quotation marks omitted).

The question of arbitrability—does the arbitration agreement cover a particular dispute—is a "gateway matter" to be

---

[4] International arbitration agreements like this one are subject to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which is incorporated in and enforced through Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201–208. *See Doe*, 657 F.3d at 1213 n.9.

resolved by the court or an arbitrator. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). Parties can agree to arbitrate the gateway issue of arbitrability by including a provision in the agreement delegating this decision to the arbitrator. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). When there is "clear and unmistakable evidence" of an agreement to arbitrate the question of arbitrability, the arbitrator, not the court, should decide whether the arbitration provision applies to a claim. *Martinez v. Carnival Corp.*, 744 F.3d 1240, 1246 (11th Cir. 2014) (internal quotation marks omitted).

To determine whether the district court erred in compelling arbitration here, we must address two issues. First, did the district court err in deciding the question of arbitrability? Second, if the district court did not err in deciding the question of arbitrability, did it err in deciding that the parties had agreed to arbitrate their dispute? We address each question in turn.

Turning to the first issue, whether the court or the arbitrator should decide the arbitrability of the plaintiffs' tort claims, we note that this issue arises in this appeal because Celebrity's response to Maglana and Bugayong's argument that the arbitration clauses in their employment agreements do not cover their tort claims is that the arbitrability question should have been decided by the arbitrator, not the court. It is true that Maglana and Bugayong signed employment agreements with a delegation provision giving the arbitrator "exclusive authority" to resolve the issue of arbitrability. Doc. 26-1 at 5, Doc. 26-5 at 5. But the problem for Celebrity is that

it took precisely the opposite position in the district court. Below, it chose not to rely on its delegation provision to argue to the district court that only the arbitrator could decide arbitrability. To the contrary, it petitioned the district court to resolve the arbitrability issue by "enter[ing] an Order . . . directing Plaintiffs to proceed to arbitration." Doc. 26 at 1–2.

Celebrity thus invited any claimed error because, instead of arguing to the district court that only the arbitrator could decide arbitrability, it did the very opposite—"it asked the district court to decide for itself whether the dispute was subject to arbitration." *Doe*, 657 F.3d at 1213. "It is a cardinal rule of appellate review that a party may not challenge as error a ruling invited by that party." *F.T.C. v. AbbVie Prods. LLC*, 713 F.3d 54, 65 (11th Cir. 2013) (alteration adopted) (internal quotation marks omitted). Because Celebrity invited the district court to rule on arbitrability, we reject Celebrity's position on appeal that the arbitrator, not the court, should have decided whether the arbitration agreement covers Maglana and Bugayong's intentional tort claims.

This brings us to the second issue, whether the parties' agreements required arbitration of the plaintiffs' tort claims. We conclude that the district court erred in its interpretation of the arbitration clauses as covering the intentional tort claims based on Celebrity's conduct after it terminated the plaintiffs' employment. Our decision in *Doe* compels this conclusion. At issue in *Doe* was whether arbitration agreements with virtually the same language as the ones in this case required arbitration of a cruise ship

crewmember's intentional tort claims. The crewmember was raped while aboard the ship. *Doe*, 657 F.3d at 1209–10. When she reported the sexual assault to her supervisor, ship officials "berat[ed] her, interrogat[ed] her," and refused for weeks to let her leave the ship to obtain medical treatment. *Id.* at 1209–11. The crewmember brought several claims against the cruise line; some arose under maritime law, and others sounded in common law tort. *Id.* at 1211–12. The tort claims included false imprisonment, for forcing her to remain on the ship "against her will," and intentional infliction of emotional distress, for the way the cruise line "handled the situation and treated her." *Id.* at 1212.

The district court in *Doe* denied the cruise line's motion to compel arbitration, concluding that the tort claims arising from the aftermath of the sexual assault were outside the scope of the arbitration agreement. *Id.* We affirmed. We parsed the terms "arising from," "relating to," and "connected with" the plaintiff's employment, and concluded that although broad, these terms were not limitless. *Id.* at 1218–19. We said:

> The incidental fact that Doe might not have been on the cruise ship if she had not been working for the cruise line does not mean that her claims relate to, arise from, or are connected with the crew agreement and the services that she performed as an employee. The parties could each have fulfilled all of their duties under the crew agreement and Doe could have perfectly performed her services for the cruise line, and

the parties still be embroiled in the dispute alleged in
Doe's common law claims . . . .

*Id.* at 1219–20.

The same is true here. Maglana and Bugayong signed employment agreements that required arbitration of claims "relating to or in any way connected with the Seafarer's service" or "arising from [their] employment." Doc. 26-1 at 4, Doc. 26-4 at 19. They brought intentional tort claims based on the cruise line's actions after their termination: a false imprisonment claim for Celebrity's holding them "captive against their will" and an intentional infliction of emotional distress claim for Celebrity's treating them "like cattle." Doc. 19 at 24, 28–29. Under *Doe*'s reasoning, these claims are not "an immediate, foreseeable result of the performance of the parties' contractual duties or [the plaintiffs'] services" as cruise line employees. *Doe*, 657 F.3d at 1219. As in *Doe*, the employment agreements do not require arbitration of the intentional tort claims.

The district court distinguished *Doe* in a footnote, observing that *Doe* dealt with a "rape occurring after hours and while off-duty," whereas this case featured a "detention/quarantine in response to a public health emergency." Doc. 46 at 6–7 n.3. It decided that the quarantine was "indisputably connected to [the plaintiffs'] duties."[5] *Id.* We disagree. The cruise line's alleged treatment of

---

[5] Even if it could be said, despite *Doe*, that the plaintiffs' claims were related to their employment or services performed for the cruise line, when Celebrity

Maglana and Bugayong—keeping them onboard for weeks under miserable conditions and "draconian rules"—was unconnected to the plaintiffs' duties as beverage handlers. Doc. 19 at 28–29. There were no passengers to serve, and the cruise line was not operating any cruises. Underscoring the distinction between arbitrable claims related to the employment agreements and the intentional tort claims is the relief plaintiffs sought. Whereas back wages and repatriation are available forms of relief under the employment agreements, the tort claims seek instead compensatory damages for Maglana and Bugayong's "mental anguish." *Id.* at 29.

The district court applied a but-for test to determine whether the tort claims arose out of the employment relationship. In applying this test, it relied on an unpublished case from this court, *Montero v. Carnival Corp.*, 523 F. App'x 623, 627 (11th Cir. 2013) (unpublished). As an initial matter, this Court's unpublished decisions are "not considered binding precedent." *McNamara v. Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1060 (11th Cir. 2022) (quoting 11th Cir. R. 36-2). And we do not find the decision's reasoning persuasive in this case. In *Montero*, a crewmember injured his back

terminated Maglana and Bugayong for cause it also terminated their employment agreements. Despite ending its contractual relationship with the plaintiffs, Celebrity nonetheless forced them to remain onboard the ship for 58 days. And Maglana and Bugayong stipulated in oral argument that their tort claims are limited to Celebrity's actions that took place after their termination. The fact that the plaintiffs' duties ceased when they were terminated makes their argument against contractually obligated arbitration even stronger than Doe's.

while working aboard a cruise ship. *Id.* at 624–25. To treat the injuries, the cruise ship sent the crewmember ashore for medical treatment that resulted in his having back surgery. *Id.* at 625. He later sued his cruise ship employer, alleging that the surgery was medically unnecessary and did him more harm than good and bringing claims for unseaworthiness, maintenance and cure, and Jones Act negligence. *Id.* We determined that the claims were related to the plaintiff's employment and thus fell within the scope of the arbitration clause, which was similar to the clauses at issue here. *Id.* at 627–28. We explained that each of the claims required the plaintiff to be employed as a seaman, saying "[b]ut for Montero's service on the vessel, none of those claims would have been viable." *Id.* at 627.

The crewmember plaintiff in *Montero* did not bring any intentional tort claims, however. *See id.* at 625. The claims in *Montero* were only available to seamen, so of course the claims were related to the plaintiff's employment as a seaman. By contrast, intentional tort claims like false imprisonment and intentional infliction of emotional distress are available to all kinds of plaintiffs. Thus, the district court erred in applying *Montero*'s seaman-status test to the intentional tort claims here.

*Doe* did not apply a but-for test but rather looked at the facts alleged and the nature of the claims asserted to determine whether they fell within the scope of the parties' arbitration clause. Applying that approach here, we conclude that Maglana and Bugayong may avoid arbitration and pursue their tort claims in the district court.

## IV.    CONCLUSION

For the foregoing reasons, we reverse the district court's decision compelling arbitration of the intentional tort claims and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**